UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:24-cr-00181-JHC-1 |
| Plaintiff, | ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS |
| v. | |
| DONEALE FEAZELL, | |
| Defendant. | |

**I**
**INTRODUCTION**

This matter comes before the Court on Defendant Doneale Feazell's Motion to Suppress. Dkt. # 19.  Feazell contends that a firearm must be suppressed because it was found on his person as part of an unlawful search.  The Court has reviewed the materials filed in support of and in opposition to the motion, the rest of the case file, and the governing law.  The Court has also considered the arguments by the parties and evidence presented at the hearing on March 21, 2025.  Dkt. # 33.  Being fully advised, the Court DENIES the motion.

1

2

# II
## BACKGROUND[1]

3

4

Around 12:00 a.m. on July 28, 2024, Seattle Police Department Officer Quinton Malo

5

Teo, who was responding to a different incident, encountered two women on Boren Avenue

6

North who appeared to need assistance.  Dkt. # 19-1 at 4.  One woman had "vomit on her" and

7

could not sit up straight and the other woman was "seemingly getting spoken to[]" by a group of

8

men.  *Id.*  The less intoxicated woman told Officer Malo Teo that they had drinks with the group

9

of men in an apartment complex at Boren Avenue North (Boren Property).  *Id.*  Officer Malo

10

Teo saw one of the men "with a large afro" get into a white truck and drive away.  *Id.*

11

After responders to the incident and the women left the scene, Officer Malo Teo saw the

12

same truck parked nearby with its lights on.  *Id.*  Officer Malo Teo asked other officers to check

13

on the truck, but it left the scene, and they could not locate it.  *Id.*  Officer Malo Teo learned

14

from staff at the Boren Property that a group of six to eight men frequent the unit that the two

15

women possibly visited and that someone named Doneale Feazell was presumably their leader.

16

*Id.*  The staff had received numerous reports of the group having parties in common areas after

17

hours.  *Id.*; *see also* 3/21/25 Rough Tr. at 12–14.[2]

18

Officer Malo Teo went to a night club on Second Avenue, where the staff told him that

19

they had denied entry to a group of men with firearms who resembled the men that he had seen

20

on Boren Avenue North.  Dkt. # 19-1 at 5.  Officer Malo Teo followed the staff's directions to a

21

---

[1] Federal Rule of Criminal Procedure 12(d) provides, "When factual issues are involved in deciding a motion, the court must state its essential findings on the record."  "This requirement is mandatory."  *United States v. Martinez*, 2023 WL 3220906, at *1 (9th Cir. May 3, 2023) (citing *United States v. Prieto-Villa*, 910 F.2d 601, 610 (9th Cir. 1990)).  The facts presented in this section, which are based on Officer Malo Teo's report, body cam footage, Officer Malo Teo's credible testimony at the March 21, 2025 evidentiary hearing, and exhibits admitted at that hearing, are the Court's essential findings.

[2] The Court cites the rough draft of the evidentiary hearing transcript, which is attached as an appendix to this Order.  The final transcript will be filed in due course.

nearby parking lot where he found the white truck that he had seen earlier that evening based on its having two sets of wheels. *Id.*; 3/21/25 Rough Tr. at 9–10, 16–17. Officer Malo Teo took down the license plate number and was "[a]bout three to four-car lengths" away when he saw the driver of the truck, who he viewed as "African American," with "a large frame" and "dread-like hair."[3] 3/21/25 Rough Tr. at 17. Officer Malo Teo also saw that the driver had "braids." *Id.* at 27, 32–33. The driver noticed Officer Malo Teo. *Id.* at 20. Officer Malo Teo returned to his vehicle about one to two minutes later. *Id.*

At around 1:46 a.m., Officer Malo Teo informed other officers of the direction that the truck was heading as it pulled out of the parking lot. Dkt. # 19-1 at 5; 3/21/25 Rough Tr. at 23–24. Officers followed the truck as it was southbound on Second Avenue and Blanchard Street and attempted to pull the truck over with lights and sirens as it turned west on Stewart Street. Dkt. # 19-1 at 5. The truck escaped the officers and ran a red light on First Avenue and Stewart Street. *Id.* An officer observed that the driver was a Hispanic male with short hair. 3/21/25 Rough Tr. at 26 (referring to Govt. Ex. 1 at 3). An officer[4] also observed that the driver was "definitely Hispanic" and was "not black." Dkt. # 19-4. The estimated time between Officer Malo Teo's viewing the driver and the white truck's escaping the officers was about three to four minutes. 3/21/25 Rough Tr. at 25.

During the day on July 28, 2024, Officer Malo Teo continued to investigate and exchanged text messages with a staff member at the Boren Property who told him at 5:00 a.m.

---

[3] In his report, Officer Malo Teo says that when he was in the parking lot, he "saw Feazell to be driving." Dkt. # 19-1 at 5. At the evidentiary hearing, he clarified that he did not know that Feazell was the driver at that time but wrote this in his report based on "information gathered later when I was writing this report." 3/21/25 Rough Tr. at 18–19.

[4] It is unclear from the record if this was the same officer who observed that the driver was a Hispanic male with short hair.

that morning that "the white truck came and left very quickly."[5]  Govt. Ex. 2 at 3.  Officer Malo

Teo asked the staff member again about the people associated with the unit that the two women

possibly visited, and the staff member responded that the leader of the group "is here all the

time."  Govt. Ex. 2 at 7–9.  Officer Malo Teo asked, "What does he look like, Afro? Braids?" *Id.*

at 9.  When asked at the evidentiary hearing why he asked this question, Officer Malo Teo

testified, "Just based off seeing the first [person] with the Afro, and then ascertaining if my

driver had braids is what I saw on the – later that night."  3/21/25 Rough Tr. at 32.  The staff

member responded, "His name is Doneale Feazell," added the description, "Yellow braids," and

sent three photos, one of which was of him sitting next to a woman.  Govt. Ex. 2 at 9–11.

Officer Malo Teo recognized Feazell as the driver of the white truck based on his braids and

large build.  3/21/25 Rough Tr. at 33, 84–85.

At 10:00 p.m., the staff member told Officer Malo Teo that Feazell and his group were

refusing to leave a common room and called 911 to report that they were trespassing.  Dkt. # 19-

1 at 5.  When Officer Malo Teo responded to the call with other officers, he entered the common

room and recognized Feazell as the driver of the white truck because of his blond braids and

large build.  3/21/25 Rough Tr. at 41–42.  The officers detained Feazell, frisked him, and found a

firearm.  Dkt. # 19-2 at 1:53–4:59.  Feazell asked why he was under arrest, and Officer Malo Teo

responded, "for eluding . . . you drove away from us yesterday . . . in a white truck." *Id.* at 4:14–

4:23.  When Feazell denied that he eluded the officers, Officer Malo Teo said "I watched you."

*Id.*

---

[5]In his report, Officer Malo Teo says that the white truck "had been at the [Boren Property] dropping off Feazell."  Dkt. # 19-1 at 5.  But as discussed above in footnote 3, it appears that at this time Officer Malo Teo did not know what Feazell looked like.  *See* 3/21/25 Rough Tr. at 31 (Officer Malo Teo confirms that the driver of the truck "dropped someone off").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## III
### DISCUSSION

"Under the Fourth Amendment, a warrantless arrest requires probable cause." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).  Officers have probable cause to arrest when they have "reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Id.*  Probable cause "is not a high bar," but rather "requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (cleaned up).  The Government bears the burden of showing probable cause for a warrantless arrest.  *United States v. Valencia*, 24 F.3d 1106, 1108 (9th Cir. 1994).  If the Government does not show probable cause, evidence seized incident to an unlawful arrest is excludable.  *See Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996).

Officer Malo Teo had probable cause to arrest Feazell for eluding law enforcement.[6] Feazell does not dispute that Officer Malo Teo had probable cause to arrest the driver of the white truck for eluding.[7]  He only contends that Officer Malo Teo lacked probable cause to identify him as the driver.  The parties do not cite a standard for evaluating whether Officer Malo Teo's identification is sufficient for probable cause to arrest Feazell.  In assessing identifications made by *non-officer* witnesses, the Ninth Circuit has examined five indicia of reliability: "1) the opportunity to view the criminal at the time of the crime; 2) the degree of attention paid to the

---

[6] Because the Court concludes that Officer Malo Teo had probable cause to arrest Feazell for eluding law enforcement, it does not reach whether he also had probable cause to arrest Feazell for trespassing at the Boren Property.

[7] Under Washington law, it is a felony for the driver of a motor vehicle to recklessly elude a pursuing police vehicle that has given a signal for the driver to stop.  RCW 46.61.024.  Even if Officer Malo Teo did not see the white truck elude officers firsthand, the knowledge of the other officers is imputed to him through the collective knowledge doctrine.  *See United States v. Ramirez*, 473 F.3d 1026, 1036–37 (9th Cir. 2007).

criminal; 3) the accuracy of the prior descriptions of the criminal; 4) the level of certainty

demonstrated at the time of confrontation; and 5) and the length of time between the crime and

the confrontation." *Grant v. City of Long Beach*, 315 F.3d 1081, 1087 (9th Cir. 2002), *opinion

amended on denial of reh'g*, 334 F.3d 795 (9th Cir. 2003).

Even if the Court needed to evaluate these indicia of reliability as to an *officer's*

identification of a suspect, Officer Malo Teo's identification is sufficiently reliable.[8]  Officer

Malo Teo viewed the driver of the white truck three to four minutes before it eluded law

enforcement.  He also viewed the driver for at least long enough for the driver to notice him.  He

testified that he was "[v]ery" confident that "the driver was a larger-statured black male with

braids" and that he was sure that the driver was Feazell when he saw him at the Boren Property.

3/21/25 Rough Tr. at 27, 41–42.  Officer Malo Teo's certainty is supported by the fact that he

saw that the driver had a large stature and braids, which are distinctive features.  Defense counsel

did not challenge this observation on cross-examination,[9] and the Court confirmed this fact

through its own questioning.  3/21/25 Rough Tr. at 84–85.  And the record does not suggest that

a suspect other than Feazell had a large stature and braids.  Finally, less than a day had passed

between Officer Malo Teo's viewing the driver of the white truck and his encounter with Feazell

at the Boren Property.  Even less time elapsed between Officer Malo Teo's viewing the driver

and seeing photos of Feazell sent by the Boren Property staff, along with information that the

white truck had returned to the property.  *See Lopez*, 482 F.3d at 1074 ("[I]t is permissible to

consider a general physical description where it is found in combination with other particularized

---

[8] The Court does not assess "the accuracy of prior descriptions of the criminal" because there are no relevant prior instances of a driver of a white truck eluding law enforcement.

[9] *See* 3/21/25 Rough Tr. at 62–64.  Defense counsel also assumed that Officer Malo Teo saw the driver with a large build and braids.  *See id.* at 65.

bases for suspicion."). Officer Malo Teo's observation of the driver of the white truck was not perfect. But "[n]either certainty, nor proof beyond a reasonable doubt, is required for probable cause to arrest." *United States v. Harvey*, 3 F.3d 1294, 1296 (9th Cir. 1993).

That there were also descriptions of the driver as Hispanic or having short hair does not mean that Officer Malo Teo lacked probable cause to arrest Feazell. To be sure, officers "may not disregard facts tending to dissipate probable cause." *Lopez*, 482 F.3d at 1073 (citation omitted). But "[t]he determination whether there was probable cause is based upon the information the officer had at the time of making the arrest." *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008). Officer Malo Teo did not recall hearing another officer's description of the driver as being Hispanic, and Feazell does not point to evidence showing that the other officers who were with Officer Malo Teo when he arrested Feazell knew of alternative descriptions of the driver. 3/21/25 Rough Tr. at 26, 68. Feazell also concedes that the collective knowledge doctrine generally "*cannot* be used to impute to an officer facts . . . which exonerate an arrestee." *United States v. Villasenor*, 608 F.3d 467, 476 (9th Cir. 2010) (quoting *Savino v. New York*, 331 F.3d 63, 74 (2d Cir. 2003)); Dkt. # 27 at 3 n.2.

Even if the collective knowledge doctrine could so be applied, Feazell has not shown that another officer's identification of the driver is at least as reliable as Officer Malo Teo's identification. Feazell says that the identification of the driver as Hispanic should be given the same weight as Officer Malo Teo's identification of the driver as Feazell because both identifications were made at night. But based on the record, these identifications were made under materially different circumstances: whereas the other officers viewed the driver from their vehicles while attempting to stop the white truck, Officer Malo Teo saw the driver on foot while the white truck was parked and observed him long enough for the driver to notice him.

Thus, the Court concludes that Officer Malo Teo had probable cause to arrest Feazell for eluding law enforcement and that officers lawfully found a firearm on his person.

**IV**
**CONCLUSION**

For these reasons, the Court DENIES Defendant's Motion to Suppress.

Dated this 26th day of March, 2025.

_John H. Chun_
John H. Chun
United States District Judge

ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS - 8

# Appendix A

```
 1                      MARCH 21, 2025

 2                      USA V. FEAZELL

 3                      MOTION HEARING

 4                       ROUGH DRAFT

 5          THE CLERK:  Please rise.

 6      The United States District Court for the Western District

 7  of Washington is now in session, the Honorable John H. Chun

 8  presiding.

 9          THE COURT:  Good afternoon, everyone.

10      Please be seated.

11          THE CLERK:  This is case number CR24-181, United

12  States versus Doneale Feazell.

13      Counsel, please rise and make your appearances for the

14  record.

15          MS. CRISHAM:  Good afternoon, Your Honor.

16      Kate Crisham for the United States.

17          MR. KENNEDY:  Good afternoon, Your Honor.

18      Andrew Kennedy on behalf of Mr. Feazell, who is here at

19  counsel table with me.

20      Also at counsel table is paralegal, Megan Blumm.

21          THE COURT:  Okay.  This is how we'll proceed today.

22  We'll have the evidentiary hearing on the motion to suppress

23  that was filed by the defendant, I'll then hear oral argument

24  from counsel, and then we'll proceed to the pretrial conference,

25  which should not take too long, all right?
```

 1          MS. CRISHAM:  Would Your Honor like me to call our

 2   first witness?

 3          THE COURT:  Yes, please.

 4          MS. CRISHAM:  Your Honor, the government calls Seattle

 5   Police Department Officer Quinton Malo Teo.

 6          THE CLERK:  Good afternoon.

 7      Please come forward.

 8      Please raise your right hand.

 9                      **QUINTON MALO TEO**,

10   called as a witness on behalf of the Plaintiff, having been

11   first duly sworn, was examined and testified as follows:

12          THE WITNESS:  I do.

13          THE CLERK:  Thank you.

14      Please take the stand.

15      Please state your name and spell it for the court reporter.

16          THE WITNESS:  Quinton Malo, Q-U-I-N-T-O-N, M-A-L-O.

17          MS. CRISHAM:  May I inquire?

18          THE COURT:  Go ahead.

19                      DIRECT EXAMINATION

20   BY MS. CRISHAM:

21   Q.   Good afternoon.

22      What do you do for a living?

23   A.   Seattle Police Officer.

24   Q.   Okay.  And can you tell us briefly about your training and

25   experience?

1  A.    I've been a Seattle Police Officer for about two years now.

2  Experience has always been here in West Precinct or in this

3  immediate vicinity.

4  Q.    Okay.  And have you been a patrol officer?

5  A.    Yes, ma'am.

6  Q.    And what is your current assignment?

7  A.    A patrol officer here in West Precinct during nighttime.

8  Q.    Okay.  And what is your shift?

9  A.    7 p.m. to 5 a.m.

10  Q.    And what are your duties and responsibilities as a patrol

11  officer?

12  A.    Answer dispatched calls, caretaking of the public, and the

13  safe care and well being of the citizens here in Seattle.

14  Q.    I'd like to direct your attention to right around midnight

15  on July 28th of 2024.  Were you on duty that night?

16  A.    I was.

17  Q.    Were you wearing a marked police uniform and in a marked

18  car?

19  A.    I was.

20  Q.    Which shift were you working?

21  A.    Third watch.

22  Q.    And that's the 7 p.m. to 5 a.m. shift?

23  A.    Yes, ma'am.

24  Q.    Did you respond to a call at 130 Boren Avenue North?

25  A.    I did.

```
 1    Q.    What was the nature of that call?

 2    A.    Nature of that call was in regards to a woman possibly

 3    shining a flashlight out the window.  And people thought it was

 4    an SOS symbol.

 5    Q.    Could you describe -- or, I guess, were you familiar with

 6    130 Boren Avenue North?

 7    A.    I was.

 8    Q.    Okay.  And how were you familiar with it?

 9    A.    It's directly in my sector, so my area of responsibility.

10    Q.    Is it essentially in an apartment building that runs into a

11    motel?

12    A.    Yeah.  It's a hotel and apartment that's connected

13    together.

14    Q.    Is it known as the Onni Boren?

15    A.    Yes.

16    Q.    What did you see when you arrived?

17    A.    When I arrived, I noticed two females that seemed a little

18    out of place.

19    Q.    What do you mean by that?

20    A.    Uhm, both of them were in white dresses.  There's not a lot

21    -- there's no bars or clubs nearby.  And one of the women had

22    vomit covering her dress.

23    Q.    So what did you do?

24    A.    I rolled down my window and asked if they needed

25    assistance.
```

1    Q.    Was there anyone else in the vicinity?

2    A.    There was.

3    Q.    And who was there?

4    A.    It was a group of five to six African American males.

5    Q.    And were they interacting at all with either of the two

6    women?

7    A.    They were.

8    Q.    What did you see?

9    A.    A conversation between one and -- one of the females and

10   the group.

11   Q.    Okay.  So what did you do then?

12   A.    I asked if they needed assistance, the two females.  One of

13   the two females, the one who was speaking with the group of

14   males, looked back and said, No, we don't need any help.  And

15   then began to assist her friend to -- just to walk and stand up.

16   That friend who needed assistance that had vomit on her dress,

17   her head fell back and she said, I'm not okay.

18   Q.    So what did you do?

19   A.    I exited my vehicle.

20   Q.    What did the men do?

21   A.    Walked away.

22   Q.    And tell us about your conversation with the two women.

23   A.    Uhm, I talked to the more sober of the two, uhm, and she

24   stated that they were fine.  I pointed out that her friend was

25   drunk and that she's not fine, she's covered in vomit, was

1   unable to stand up, was unable to hold consciousness for longer

2   than a minute.  After a brief conversation between the two, she

3   had the idea that she was pos- -- that the sober one had the

4   idea that she was possibly drugged.

5   Q.   That her friend had been drugged?

6   A.   Yes.

7   Q.   Okay.  And just so the record is clear, did you come to

8   learn that the woman who seemed incapacitated and had vomit on

9   her, was her name Thalia, T-H-A-L-I-A, Timeteo, T-I-M-E-T-E-O?

10  A.   Yes.

11          THE COURT:  Counsel, if you could stop for just a

12  moment, I want to let the court reporter know that the realtime

13  isn't working.

14                    (Off the record.)

15          THE COURT:  All right.

16          MS. CRISHAM:  Thank you.

17  BY MS. CRISHAM:

18  Q.   And was the other female's name Lindsy, L-I-N-D-S-Y, Hatch,

19  H-A-T-C-H?

20  A.   I believe so, yes.

21  Q.   Okay.  And can you -- did Ms. Hatch subsequently provide

22  you with some information about what had happened earlier that

23  night?

24  A.   She did.

25  Q.   Okay.  And can you kind of summarize what she said to you?

A.    Yeah.  They were planning on going out on the town.  They

had met a group of males who seemed nice and asked them if they

wanted to join.  They agreed, got in --

Q.    Were these the same males that you had seen the two women

talking to or Ms. Hatch talking to?

A.    I believe so, yes.

Q.    Okay.

A.    They agreed, got into the truck, that was pointed out later

on.  The males then took 'em to an apartment at 130 Boren, where

they were given drinks.  Ms. Hatch then told me that they were

served mixed drinks, shots and chaser.  She did point out that

none of the males drank at all.  And then they had been planning

on going to the bars, which is where I had ran into them.  Or

had appeared.  The men then told the ladies to get out of the

truck, they kicked them out of the truck, told them not to speak

with me, and to go back up to the room.

Q.    Okay.  So Ms. -- that's what Ms. Hatch told you is that

when -- that they were in a white truck -- or they were in a

truck, and then when they saw law enforcement, they saw you, the

men told her and Ms. Timeteo to leave the truck and go back up

to the apartment?

A.    Yes, ma'am.

Q.    Okay.  Did Ms. Hatch know the name of the apartment unit

that the men had taken her to?

A.    She did not know it fully.  She remembered it ending in 07.

1    Q.    Okay.  And did she say anything about Ms. Timeteo's state

2    of inebriation versus her own?

3    A.    I'm sorry, can you repeat that?

4    Q.    Did she say anything about how inebriated Ms.

5    Timeteo appeared to be, as opposed to --

6              THE COURT REPORTER:  I'm sorry, can you slow down,

7    please.

8              MS. CRISHAM:  Sure.

9    BY MS. CRISHAM:

10   Q.    Did she say anything about how inebriated Ms. Timeteo

11   appeared to be?

12   A.    Yes.  She said that they were drinking relatively at the

13   same pace, uhm, and that her friend -- she noticed her friend

14   extremely intoxicated doubled over than what her mentality was

15   and her sobriety was.

16   Q.    And were you observing Ms. Timeteo as the same time as you

17   were having this conversation with Ms. Hatch?

18   A.    I was.

19   Q.    And what was she doing?

20   A.    Vomiting, unable to sit up.  Throughout the whole

21   conversation, her friend was consistently pulling her back up

22   from falling down, and in and out of consciousness.

23   Q.    And what was your reaction to all of this?

24   A.    I was worried for her.  I requested SFD to come check her

25   out.

1    Q.    And when you say "SFD," do you mean Seattle Fire

2    Department?

3    A.    I do.

4    Q.    Okay.  And did they come to check her out?

5    A.    They did.

6    Q.    And what did they determine?

7    A.    That she was possibly drugged.

8    Q.    Did they advise that she go to the hospital?

9    A.    They did.

10   Q.    And did Ms. Timeteo decline?

11   A.    They did.

12   Q.    Okay.  While you were there and while this was going on,

13   did you see the truck that the men had been in?

14   A.    Yes.

15        So during the conversation, a black male walked across the

16   street towards a white truck.  This is at the same time that I

17   was having a conversation about the vehicle.  I pointed out the

18   truck, asked the ladies if this is the truck that they were

19   talking about, and they answered and they affirmed.

20   Q.    Okay.  Was there anything noticeable about that truck?

21   A.    Yeah.  It was a larger white truck.  Most noticeably it had

22   -- it was a dually, so it had four wheels in the back.

23   Q.    A dually?

24   A.    Yeah.  That's what they're -- yeah.  That's what they're

25   called.

1  Q.    Is that kind of the colloquial term for trucks with two
2  sets of wheels?  Okay.
3        And you said that you saw a black male walking, get in the
4  car.  Did you see what seat he got in?
5  A.    I didn't, no.
6  Q.    Okay.  And can you describe that black male with any
7  greater detail?
8  A.    He had a large Afro.
9  Q.    Okay.  Did you see who was driving?
10 A.    I did not.
11 Q.    Shortly after the black male entered that truck, did the
12 truck leave?
13 A.    Yes.
14 Q.    Okay.  And what -- did you observe it come back?
15 A.    I did.  It parked about two blocks away from me, behind
16 us -- right behind myself, with clear view of the females and
17 myself.
18 Q.    And did you have any concerns about that?
19 A.    Yeah.  I thought it to be odd for the truck that we were
20 speaking about to park behind me.  As an officer safety risk, I
21 requested an additional officer.
22 Q.    Okay.  And did an additional officer eventually come?
23 A.    It did.
24 Q.    And who was that?
25 A.    I believe it was Officer Cummins.

1    Q.    Excuse me, who?

2    A.    Oh, excuse me, Officer Tanner -- Tanner Jay.

3    Q.    Okay.  And at some point, then, did you make sure that the

4    two women were safely in an Uber going to a friends house?

5    A.    I did.

6    Q.    And once Officer Jay arrived, did the two of you go into

7    the apartment building to try to learn some more information?

8    A.    We did.

9    Q.    Why did you want to learn more information?

10   A.    I had a lot of questions unanswered throughout the whole

11   thing.

12   Q.    And can you tell us a little bit more about that?

13   A.    Yeah.  It's -- I found it very odd that two girls that

14   seemed unsuspecting were told not to speak with law enforcement.

15   That's relatively odd.  I found it odd that when I arrived, they

16   were kicked out of their vehicle, the vehicle they were supposed

17   to be in, and told to go up to the room and not say anything to

18   me; as well as the group of men essentially leaving, but just

19   being in an eye-shot distance of me.  And being that they were

20   associated with the building, I wanted to find out more

21   information.

22   Q.    Were you also concerned about Ms. Timeteo's state of

23   incapacitation?

24   A.    Yes.

25   Q.    Okay.  And so did you talk to apartment staff?

1   A.    I did.

2   Q.    And did you talk to several different people in the

3   apartment?

4   A.    I did.

5   Q.    Did you talk to someone named Adam Mason, M-A-S-O-N?

6   A.    Yes, ma'am.

7   Q.    And what was his role?

8   A.    I believe he was head of security or a security operator

9   there.

10  Q.    First of all, just to kind of close the loop on what caused

11  you to come initially to this apartment building, did you make

12  any efforts to further investigate the report of the woman who

13  had been flashing the lights?

14  A.    We did.

15  Q.    Okay.  And did you find anything?

16  A.    No, we did not.

17  Q.    Okay.  Did the apartment staff still provide you with some

18  additional information about the group of men who had been

19  talking to Ms. Hatch and Ms. Timeteo?

20  A.    Yes can.

21  Q.    What did they say?

22  A.    After checking out the apartments that we assumed where the

23  flashlight where was coming from, I asked if there was anymore

24  issues with any units that could be relatively in the same

25  vicinity.  A manager there was able to give me some information

1  on some units that they were having issues with that seemed to

2  have matched that agenda.

3  Q.    Did the manager indicate that there were kind of multiple

4  groups that were causing problems for the apartment building?

5  A.    Yes, ma'am.

6  Q.    And did the apartment manager provide any information about

7  the people associated with Unit 707?

8  A.    Yes, ma'am.

9  Q.    What did they what did they say?

10 A.    That the apartment was rented out by a female, which at the

11 time the security officer had never seen before, except for the

12 day of signing.  They said that the apartment was frequented

13 about -- a large group of black males who had been throwing

14 parties, had been in common spaces that were -- it was after

15 hours, so they were trespassing in those common spaces.  And she

16 also bel- -- or they also believed all these men were armed.

17 Q.    Okay.  And had there been complaints from residents about

18 these individuals and their behavior in the common areas?

19 A.    Yes, ma'am.

20 Q.    While you were making a phone call, did Mr. Mason provide

21 Officer Jay with the identification of the person he believed to

22 be the leader of this group?

23 A.    Yes, ma'am.

24 Q.    And did he give a name?

25 A.    He did.

1    Q.    And what did he say?

2    A.    The name was Doneale Feazell.

3    Q.    Okay.  And did he indicate that Mr. Feazell was a

4    registered sex offender?

5    A.    He did.

6    Q.    Okay.  Did you do anything to investigate whether Unit 707

7    was the apartment where Ms. Timeteo and Ms. Hatch had gone to

8    with the men to drink?

9    A.    We did.

10    Q.    Okay.  What did you do?

11    A.    We went to the apartment.  We knocked on the door.  There

12    was no answer.  I did call them back to ask -- or I called the

13    females to ask if this was possibly the apartment, and she said

14    it sounded extremely familiar, the number 707.  She also gave me

15    the information that she had lost a hair tie.  That hair tie was

16    located directly outside of Unit 707.

17    Q.    Okay.  Did you eventually leave the Onni Boren?

18    A.    We did.

19    Q.    Okay.  Did you provide your badge number and name with

20    staff?

21    A.    I did.

22    Q.    Okay.  At this point, did you consider the investigation

23    closed?

24    A.    I did not.

25    Q.    Okay.  Why not?

1    A.    I still had those questions that were unanswered.

2    Q.    So what did you do?

3    A.    I immediately went to the -- given the information that I

4    had, that these guys were going to bars, I went to the nearest

5    bar that I knew of that was in my sector, and that would be the

6    Vue Nightclub.

7    Q.    That's V-U-E?

8    A.    Yes.

9    Q.    Where is Vue Nightclub located?

10   A.    Around Second -- it's on Second Avenue near 2 and Bell.

11   Q.    Okay.  And so you said this was one of the major clubs kind

12   of in the area?

13   A.    Yes.  So this -- from what I know, this nightclub is the

14   only nightclub that has that security staff, not just a front

15   doorman.  They assist the other bars and nightclubs around when

16   they need to extradite people out of the bar, or if they have

17   people they need trespassed, Vue is largely responsible for a

18   lot of those.

19   Q.    So did you talk to anyone at Vue?

20   A.    I did.

21   Q.    What did -- who did you talk to?

22   A.    A security -- the head of security there, who I have a

23   great relationship with, who was also a police officer in

24   Chicago.  She told me that she had recently denied entry to

25   about five or six black males who were drinking on the sidewalk,

1    and all of them were armed.

2    Q.    Okay.  And based upon her description of this group, did

3    you come to any conclusion about whether or not they might be

4    associated with the men in Unit 707?

5    A.    I had an idea that they possibly were.  They weren't able

6    to give me camera footage, nor did I have the right to ask for

7    camera footage at that time.  I just needed to do a little bit

8    more footwork.

9    Q.    And did you ask where the men had gone?

10   A.    I did.

11   Q.    Okay.  And what did the security officer say to you?

12   A.    She had pointed me in the direction that the males had

13   left.

14   Q.    So what did you do?

15   A.    I followed that direction.

16   Q.    Okay.  Just to be clear, were you in your car or were you

17   on foot?

18   A.    I was on foot.

19   Q.    Okay.  And did you come upon anything of note?

20   A.    Yes.  So behind -- across the street and behind a strip of

21   buildings, there's a parking lot.  I was able to walk down the

22   stairs into this parking lot, and I found the white truck that

23   was at the Onni.

24   Q.    I'm sorry, you found the white truck that what?

25   A.    That was at the Onni, the -- at 130 Boren.

1    Q.    And how did you know it was the same white truck?

2    A.    Largely because of the wheels.

3    Q.    Okay.  And what did you do then?

4    A.    I was able to grab a license plate number.  And then I --

5    as I was getting the license plate number, I was able to see a

6    large group of people, now it was about 20 or 30 people in this

7    parking lot.  Once I got this license plate number, I made

8    myself safe, going back to my patrol vehicle.

9    Q.    Did you see anyone in the white truck?

10    A.    Yes.

11    Q.    Okay.  What did you see?

12    A.    I saw a large frame in the driver chair.  Mostly because of

13    my stature, I noticed that this male to be much larger than

14    myself.  I also noticed dread-like hair on this person.

15    Q.    And were you able to tell the person's race?

16    A.    Yes.

17    Q.    And what was that?

18    A.    African American.

19    Q.    Could you see anyone else in the truck?

20    A.    I saw figures, but not -- I couldn't point out anything of

21    detail.

22    Q.    Approximately, how far away were you from this man in the

23    driver's seat when you made this observation?

24    A.    About three to four-car lengths.

25    Q.    Do you see that driver in the courtroom today?

1    A.    I believe so, yes.

2    Q.    Okay.  And can you describe that person by the article of

3    clothing he's wearing?

4    A.    Tan top, with glasses.

5          MS. CRISHAM:  Okay.  Your Honor, may the record

6    reflect that the witness identified the defendant, Doneale

7    Feazell.

8    BY MS. CRISHAM:

9    Q.    Now, at that point, did you know the name of this man that

10   was in the driver's seat?

11   A.    I'm sorry, can you repeat that?

12   Q.    At that point, did you know the name of the person that was

13   in the driver's seat?

14   A.    I did not.

15   Q.    Okay.  Looking at your report, which is Exhibit 4, and

16   looking at page 4 of that -- and, I'm sorry, it's actually, if

17   you look at the bottom, it says dash -- 4-015.

18   A.    Yes, ma'am.

19   Q.    Okay.  And if you could read the first paragraph there at

20   the top.

21   A.    Beginning with "officers"?

22   Q.    You don't need to read it out loud, just read it to

23   yourself.

24   A.    Okay.

25   Q.    Did you write in the report that you had seen Feazell

1    driving?

2    A.    I did.

3    Q.    Okay.  And at the time that you saw this truck, did you

4    know that the driver was Mr. Feazell?

5    A.    No.

6    Q.    Okay.  And is there a reason why you described it that way

7    in the report?

8    A.    This was information gathered later when I was writing this

9    report.

10   Q.    Okay.  When you saw the white truck, did you turn on your

11   body-worn video?

12   A.    I did not.

13   Q.    Why not?

14   A.    Based on officer safety.  Not only was I explained to a

15   security -- a head of security at the club who I entrust very,

16   very well that they were armed, the parking lot was about 20 to

17   30 people deep.  I was by myself, on foot, nowhere near my

18   patrol vehicle.  It is also very, very apparent when I reach for

19   my chest, uhm, to activate my camera, which makes an audible

20   sound.  Lastly, there is -- I stick out like a sore thumb being

21   a uniformed and marked patrol officer in a club parking lot full

22   of people who are now staring at me.  So the action of me

23   putting on -- turning my camera on in that moment puts myself at

24   risk.

25   Q.    Okay.  So it was your intent simply to get the license

1  plate number and then leave?

2  A.    Correct.

3  Q.    Okay.  So what did you do next?

4  A.    I went to my patrol officer -- or I went to my patrol car,

5  once the license plate was given, and began to follow up with

6  officers who had found the -- found the white truck driving

7  away.

8  Q.    Okay.  So I'm going to break that down.

9        First, when you were in the parking lot or near the parking

10  lot, did the driver of the white truck notice you?

11  A.    Yes.

12  Q.    Okay.  And what happened then?

13  A.    They all left.

14  Q.    Okay.

15  A.    Or they all began to leave.

16  Q.    Okay.  Did -- would it be fair to say that the driver of

17  the white truck kind of peeled out quickly?

18  A.    Very much so.

19  Q.    Okay.  And so you said you went back to your patrol

20  vehicle.

21        How long did it take you to get, from observing the white

22  truck with the man we now know to be the defendant in the

23  driver's seat, to your vehicle?

24  A.    One to two minutes.

25  Q.    Okay.  And then you said you radioed out the description of

1    the car and the license plate?

2    A.    Yes, ma'am.

3    Q.    Okay.  And did you ask for any action to be taken?

4    A.    I did.  I asked for additional officers.

5    Q.    Okay.  Do you have independent recollection about what time

6    that was?

7    A.    Not really, no.

8    Q.    Okay.  In preparation for this hearing, did you review a

9    CAD report of this incident number?

10   A.    I did.

11   Q.    And what is a CAD report?

12   A.    It's the basic report of entries made through radio or

13   dispatch, any details that dispatch feels is pertinent to the

14   call.

15   Q.    If you could look at the binder that's in front of you, and

16   look specifically at item 2 or tab 2.  Do you recognize that?

17   A.    I'm sorry, say that one more time.

18   Q.    Do you recognize the document that's in -- that's

19   Exhibit 1?

20   A.    Yes.

21   Q.    And what is that?

22   A.    This would be a CAD report.

23         MS. CRISHAM:  Okay.  Your Honor, I would to admit

24   Exhibit 1.

25         MR. KENNEDY:  No objection, Your Honor.

1          THE COURT:  Exhibit 1 is admitted.

2              (Plaintiff Exhibit 1 admitted.)

3   BY MS. CRISHAM:

4   Q.    All right.  And does this CAD report indicate what time you

5   called for assistance locating the white truck?

6   A.    It does.

7   Q.    Okay.  I'm going to pull that up.

8         If you could look at page 5.  And I also have that up on

9   the screen here.

10        Does this show the various -- the call-out that you made

11   with the white truck's license plate?

12   A.    It does.

13   Q.    Okay.  First of all, does this indicate what your call

14   number was that night?

15   A.    It does.

16   Q.    And what was your call number?

17   A.    3-David-2.

18   Q.    Okay.  So 3D2?

19   A.    Yes, ma'am.

20   Q.    And you said that Officer Jay had joined you to talk with

21   some of the staff at the apartment building?

22   A.    He did.

23   Q.    Do you also see Officer Jay's call number here?

24   A.    I do.

25   Q.    And what was his call number?

1    A.    3-David-3 or the 3D3 there.

2    Q.    Okay.  So looking first at -- starting at 1:37, it

3    indicates that 3-David-3 is making out -- is sending calls

4    requesting information for someone named Doneale Feazell.  Do

5    you see that?

6    A.    I do.

7    Q.    Okay.  And what was that?

8    A.    It's him running his name.

9    Q.    Okay.  And that was based upon Mr. Mason providing the name

10   of Doneale Feazell?

11   A.    I believe so.

12   Q.    Okay.  And then moving up to 1:46, and we see your call

13   number 3D2?

14   A.    Yes, ma'am.

15   Q.    Okay.  And it looks like there's a license plate D60239B?

16   A.    Yes, ma'am.

17   Q.    And was that the license plate of the white truck?

18   A.    It was.

19   Q.    Okay.  And so was this about right around when you saw

20   Mr. Feazell in the driver's seat and then driving in the white

21   truck?

22   A.    I would assume so, yes.

23   Q.    Okay.  About 1:46?  Okay.

24        And then scrolling up, after you called out the license

25   plate, did you ask for a stop to be made of that vehicle?

1    A.    I did.

2    Q.    And did you ask for additional units?

3    A.    I did.

4    Q.    Did you have eyes on the truck at this point?

5    A.    When the additional units were requested, I did.

6    Q.    Okay.  And then, at some point, then, did Officer Jay also

7    see the truck?

8    A.    Yes.

9    Q.    And are you able to tell that from this CAD report?

10   A.    I am.  At 1:47 3D3 requests two more units southbound 1

11   from Bell.

12   Q.    Okay.  And then looking at the top of the page, does it

13   also say Fairview Avenue North and John Street?

14   A.    Yes, ma'am.

15   Q.    Okay.  And then going to page 4, at the very bottom, does

16   it indicate that Officer Jay is going to attempt a high-risk

17   stop?

18   A.    Yes, ma'am.

19   Q.    Okay.  And then looking at 1:48, it says Southbound 2 from

20   Blanchard.  And this is also a call-out from Officer Jay.  What

21   does this indicate?

22   A.    That's where the truck and Officer Jay are heading.

23   Q.    Okay.  So he's following, he has eyes on the truck, it's

24   going southbound on Second from Blanchard?

25   A.    Yes, ma'am.

1    Q.    Okay.  And then do you call out at 1:48 that you're behind

2    Officer Jay?

3    A.    I do.

4    Q.    Okay.  And then does Officer Jay indicate that he sees the

5    truck going westbound on Second and Stewart Street?

6    A.    Yes, ma'am.

7    Q.    And that's at 1:49?

8    A.    Yes, ma'am.

9    Q.    Okay.  And then going up even further, does Officer --

10   Officer Jay indicate eluding westbound from First Avenue on

11   Stewart?

12   A.    Yes, ma'am.

13   Q.    Okay.  And then, again, the suspects elude?

14   A.    Yes, ma'am.

15   Q.    And then it indicates, then, that the unit's going back to

16   the apartment on Boren?

17   A.    Yes, ma'am.

18   Q.    Okay.  And so looking at this, are you able to have a

19   greater sense of how soon from when you saw Mr. Feazell in the

20   driver's seat to when that white truck eluded officers, about

21   how many minutes that was?

22   A.    Three to four.

23   Q.    Okay.  Based on that timeline, did you reach a conclusion

24   as to whether the person that you saw in the driver's seat was

25   also the same person that failed to stop for Officer Jay?

1    A.    Yes.

2    Q.    And I guess just one other thing as well.  Did you -- were

3    you aware of whether Officer Jay put on his lights and indicated

4    for the truck to stop?

5    A.    He did.

6    Q.    Okay.  And the truck ignored it?

7    A.    Yes, ma'am.

8    Q.    And so based upon all of this, did you reach a conclusion

9    that the driver of that truck had committed the crime of

10   eluding?

11   A.    Absolutely.

12   Q.    Okay.  Looking now at page 3 at the bottom.  And there's an

13   entry, the second and third from the bottom, at 1:52, which I

14   guess several -- at 1:52 and 1:53.  And what do these indicate?

15   A.    That additional Unit 3-Mary-33 or 3M33 had advised that the

16   driver was a Hispanic male with short hair.

17   Q.    Okay.  Do you know who 3M33 is?

18   A.    I do.

19   Q.    Who is that?

20   A.    Officer Qualls.

21   Q.    Okay.  What's Officer Qualls's first name?

22   A.    Jacob.

23   Q.    Okay.  Do you recall hearing Officer Qualls' description of

24   the driver as a Hispanic male?

25   A.    I do not.

1   Q.   Do you know what you were doing at the time he called that

2   out?

3   A.   I do not.

4   Q.   Okay.  Would that have had any impact on you if you had

5   heard that Officer Qualls was describing the driver as a

6   Hispanic male with short hair?

7   A.   No.

8   Q.   Why would that not have impacted you?

9   A.   Officers have conflicting descriptions all the time based

10  on circumstances of moving fast, the light, driving, anything

11  else, you can get mixed descriptions of all kinds.

12  Q.   How confident were you in your view that the driver was a

13  larger-statured black male with braids?

14  A.   Very.

15  Q.   Okay.  So did you believe it was more likely that Officer

16  Qualls got his description wrong than that you were wrong?

17  A.   Correct.

18  Q.   And so what did you do then?

19  A.   After joining with my officers about the elusion, we went

20  back to 130 Boren -- or 120 Boren, excuse me.

21  Q.   And did you find the white truck that night?

22  A.   We did not.

23  Q.   Okay.  Did you ask apartment staff to contact you if they

24  saw the white truck?

25  A.   I did.

1    Q.    Why was it so important for you to try to find this white

2    truck?

3    A.    Similar to the answers of going to the club, I still have

4    all these questions and no answers.  And now with the elusion,

5    more so on the questions.

6    Q.    Looking again at the CAD report at page 3, I see some

7    indications about the license plate and potentially a stolen

8    vehicle.  What were you learning around this time?

9    A.    That the vehicle was probably an unreported stolen.

10    Q.    Okay.  But did you know that for certain at that point?

11    A.    No, I did not.

12    Q.    So did you think that you could definitively state whether

13    or not the driver was driving a stolen car?

14    A.    No, not at that time.

15    Q.    And so what time did your shift end?

16    A.    Around -- it's supposed to end around 5 p.m., but officers

17    on our watch leave around 4:30.

18    Q.    Okay.  And when were you scheduled for your next shift?

19    A.    7 p.m.

20    Q.    Okay.  I'd like to direct your attention back to Adam Mason

21    who was the security officer at the Onni Boren.  After you spoke

22    with him in those early morning hours of July 28th, did you stay

23    in communication with him?

24    A.    I did.

25    Q.    And kind of throughout that next day, was he providing you

1   with additional information?

2   A.    Yes, ma'am.

3   Q.    And in fact, was he texting you photos and observations?

4   A.    Yes, he was.

5   Q.    In preparation for this hearing, did you provide the

6   government with screenshots of your text communications with

7   Mr. Mason on July 28th?

8   A.    I did.

9   Q.    And if you could look at Exhibit 2 in the binder in front

10  of you.  Do you recognize those?

11  A.    I do.

12  Q.    What is it?

13  A.    Text messages with Adam.

14  Q.    With Adam, do you mean Mr. --

15  A.    Mr. Mason.

16        MS. CRISHAM:  Okay.  Great.

17  Your Honor, we'd move to admit Exhibit 2.

18        MR. KENNEDY:  No objection, Your Honor.

19        THE COURT:  Exhibit 2 is admitted.

20        MS. CRISHAM:  Okay.

21              (Plaintiff Exhibit 2 admitted.)

22  BY MS. CRISHAM:

23  Q.    And I'll pull this up.

24        Meanwhile, if you could look in your binder at pages 2

25  through 3.

1          Actually, I guess, first, looking at the first page,

2     there's a bunch of names here.  Do you know what that was

3     referring to?

4     A.    Another one of the groups that he was having issue with at

5     the building.

6     Q.    Okay.  So Mr. Mason was sending you names of a different

7     group of individuals who had caused disturbances there?

8     A.    Yes, ma'am.

9     Q.    And did he indicate whether they were connected with the

10    individuals at Unit 707?

11    A.    He did not.

12    Q.    Okay.

13          Okay.  So scrolling down here, did you receive a text at

14    5:12 a.m.?

15    A.    I did.

16    Q.    And what did the text say?

17    A.    It says, Hello, the white truck came and left very quickly.

18    This is the person driving it.  When it shows up again, I will

19    call 911.  Thank you.

20    Q.    And did Mr. Mason then append a number of pictures?

21    A.    He did.

22    Q.    Okay.  And looking at those pictures, did you conclude that

23    that was the person who was driving the white truck that you had

24    seen several hours earlier?

25    A.    Not of the first picture in the bottom left of the second

1  picture, but none of the other pictures have who I saw as the

2  driver.

3  Q.    Okay.  And you felt confident in that?

4  A.    Yes, ma'am.

5  Q.    Okay.

6        Okay.  So scrolling then to page 5, did Mr. Mason then

7  later send a text saying, Afro guy entered building, called 911,

8  orange shirt?

9  A.    Yes, ma'am.

10 Q.    Okay.  And when he said "Afro guy," what did you interpret

11 that to mean?

12 A.    The gentleman that I saw the first night who had walked and

13 entered -- or walked across the street and entered the truck.

14 Q.    Okay.  And similarly, when he talked about the driver, what

15 did you understand that to mean?

16 A.    The driver of the vehicle at that time.

17 Q.    Okay.  So that morning, he had dropped -- he had dropped

18 someone off?

19 A.    Yes, ma'am.

20 Q.    Okay.  Looking at page 7 of this exhibit, at around

21 8:10 p.m., did you ask for information about who lived in Unit

22 707?

23 A.    I did.

24 Q.    Okay.  And what happened then?

25 A.    Information was given about the renter of 707.

1    Q.    Okay.  And is this then a screenshot of the person who was

2    renting Unit 707?

3    A.    Yes, ma'am.

4    Q.    And going down then to page 8, did he provide the name and

5    date of birth?

6    A.    He did.

7    Q.    Going to page 9, can you read this next text message?

8    A.    Yes.  I personally have never seen her at all.  I see the

9    -- I'm assuming a typo -- the group of five, up to 40 people

10   come in together, different girls every time, and same guys.  I

11   only know the one guy's name that is definitely the leader, and

12   he is here all the time.  I heard from management.  They have

13   paid rent and are currently going to court to evict then --

14   them, I'm assuming -- and waiting for the next steps in that

15   process.

16   Q.    And did you then ask what this leader looked like?

17   A.    I did.

18   Q.    And specifically, did you ask whether he had an Afro or

19   braids?

20   A.    I did.

21   Q.    Why did you ask that?

22   A.    Just based off seeing the first woman with the Afro, and

23   then ascertaining if my driver had braids is what I saw on the

24   -- later that night.

25   Q.    And did Mr. Mason then send a text saying his name is

1    Doneale Feazell and sending several pictures?

2    A.    He did.

3    Q.    Okay.  I'm going to page 10.

4          Was this an additional picture?

5    A.    Yes.

6    Q.    Okay.  And did he indicate yellow braids, on sex offender

7    registry?

8    A.    Yes.

9    Q.    Okay.  Did you recognize the person in these pictures when

10   they were sent to you?

11   A.    I did.

12   Q.    And who did you recognize them to be?

13   A.    The driver of the vehicle.

14   Q.    How did you know that?

15   A.    The stature and the braids.

16   Q.    I'm sorry, the stature?

17   A.    The -- his structure, the size.

18   Q.    Okay.  And the braids?

19   A.    Yes, ma'am.

20   Q.    Okay.  And so based upon that, did you now believe you knew

21   the identity of the man that you had seen driving the white

22   truck earlier this morning?

23   A.    Yes, ma'am.

24   Q.    Okay.  And who was that?

25   A.    Doneale Feazell.

1   Q.    Okay.  Once you saw those pictures, did you come to any

2   conclusion as to whether you had probable cause to arrest

3   Mr. Feazell?

4   A.    I did.

5   Q.    Okay.  And what did you have probable cause to arrest him

6   for?

7   A.    Elusion.

8   Q.    Okay.  And based on what?

9   A.    Eluding the night prior.

10  Q.    Okay.  And was that based that you had seen him around 1:46

11  driving the car?

12  A.    Yes, ma'am.

13  Q.    And that then he was then seen driving through a red light

14  and ignoring officers at 1:49?

15  A.    Yes, ma'am.

16  Q.    Okay.  And so based upon that, you believe that it was

17  reasonable to conclude that Mr. Feazell was the one driving when

18  the elusion happened?

19  A.    Yes, ma'am.

20  Q.    Okay.  And again, even if you had been aware that another

21  officer described the driver as a Hispanic male with short hair,

22  would that have changed your view about whether you had probable

23  cause to arrest for eluding?

24  A.    Not at all.

25  Q.    Did you continue to get additional texts from Mr. Mason?

1  A.    I did.

2  Q.    Okay.  And was he also talking to you on the phone?

3  A.    He was.

4  Q.    Okay.  And did he -- let's see.  Looking at page 12, does

5  he indicate that on the system it says that Mr. Feazell's last

6  name is Lamont?

7  A.    It does.

8  Q.    Okay.  And that's not true, even though that's his middle

9  name?

10  A.    Correct.

11  Q.    And that he had found his real name when he asked him for

12  ID when he wanted keys and was out?

13  A.    Yes.

14  Q.    Did Mr. Mason at some point let you know that the men from

15  the previous night associated with Unit 707 had arrived?

16  A.    Yes, ma'am.

17  Q.    Okay.  And were you also having phone conversations?

18  A.    I was.

19  Q.    And can you kind of summarize what was being said by each

20  of you during these conversations?

21  A.    Once I received the text message that they had arrived, I

22  asked if they saw the car.  He said, No, no vehicle, no white

23  truck.  I then spoke to him asking where they were, how many,

24  where they were placed, the layout of the room.  And he was able

25  to give -- he -- the information he gave me was incorrect.

1    Q.    Okay.  Stepping back for a second, though, did Mr. Mason

2    tell you in texts and on the phone that this group of men,

3    including Mr. Feazell, were in a common room or a conference

4    room?

5    A.    They were.

6    Q.    Okay.  And that they were partying and wouldn't leave?

7    A.    Correct.

8    Q.    Okay.  And at the bottom of this page, do you ask whether

9    Mr. Feazell is with them?

10   A.    I did.

11   Q.    Okay.  And looking at page 13, did he respond?

12   A.    He did.

13   Q.    Okay.  He said, Yes?

14   A.    Yes, ma'am.

15   Q.    Okay.  And you'd been asked to keep him there, were

16   counting how many exits.  Did he then give you a call?

17   A.    Yes.  And this is -- I apologize, this is where the

18   information was incorrect.  The amount of people and the layout

19   of the room, as well as exits, were extremely incorrect.

20   Q.    Okay.  So Mr. Mason -- what do you mean by that, it was

21   incorrect?

22   A.    He told me that there were about 10 to 15 people with a

23   room about half the size of the room we are currently in.  He

24   also told me that there was only one exit into this -- entry and

25   exit into this room.  That was untrue; there was four exits as

1  well as 40 to 50 -- or, excuse me, 30 to 40.

2  Q.   Okay.  Before we get to that, once you heard from Mr. Mason

3  that Mr. Feazell and the people he was with were refusing to

4  leave, did you give him -- did you tell him to do anything?

5  A.   I told him not to spook 'em.

6  Q.   Okay.  And why did you say that?

7  A.   I wanted to get an arrest.  I wanted to get answers to my

8  questions.  It's very, very common for people who are calling in

9  to 911 to say things such as, like, I'm calling 911, they're on

10  the way, thus making those people leave.  And I would have been

11  stuck with same questions, no answers.

12  Q.   Okay.  Did you suggest that Mr. Mason call 911 to report a

13  trespass?

14  A.   I did.

15  Q.   Why did you do that?

16  A.   So that way it could be logged as a trespass.

17  Q.   Okay.  And so did he, in fact, call 911?

18  A.   He did.

19  Q.   And did you respond?

20  A.   I did.

21  Q.   Prior to responding, did you confer with other officers at

22  the West Precinct?

23  A.   I did.  I gathered about -- I gathered any officer who was

24  available for this call.

25  Q.   And did you come up with sort of a plan of what you were

1    going to do?

2    A.    We did.

3    Q.    And was the plan?

4    A.    To detain everyone in this room, being that there was only

5    one exit, this makes it extremely safe and easy for officers to

6    do so.  Our plan was to enter the room, detain everyone for

7    trespassing, identify, and possibly arrest if needed.

8    Q.    Okay.  And did you have any plan -- did you have a plan for

9    what to do with regards to Mr. Feazell?

10   A.    I did.

11   Q.    Okay.  What was that?

12   A.    Arrest.

13   Q.    Arrest for what?

14   A.    Elusion.

15   Q.    Okay.  And then did you go to the Onni Boren?

16   A.    I did.

17   Q.    Okay.  Did you initiate your body-worn video.

18   A.    I did.

19   Q.    And have you reviewed it in preparation for this hearing?

20   A.    Yes, ma'am.

21   Q.    Okay.  And did we look at it the other evening?

22   A.    Yes, we did.

23   Q.    Okay.  And is this Exhibit 3?

24         I can pull it up and just play, if you recognize it from

25   the...

1        MS. CRISHAM:  I apologize, Your Honor.

2                    (Video played.)

3   BY MS. CRISHAM:

4   Q.   Okay.  So based upon this, do you recognize this?

5   A.   I do.

6   Q.   Okay.  What is it?

7   A.   The front door at the Onni.

8   Q.   Okay.  And is this what was the caption on your body-worn

9   video that night?

10  A.   Yes, ma'am.

11        MS. CRISHAM:  Okay.  Your Honor, we'd move to admit

12  Exhibit 3.

13        MR. KENNEDY:  No objection.

14      No objection, Your Honor.

15        THE COURT:  Exhibit 3 is admitted.

16              (Plaintiff Exhibit 3 admitted.)

17        MS. CRISHAM:  Okay.  And may I publish?

18        THE COURT:  Go ahead.

19                    (Video played.)

20        MS. CRISHAM:  Okay.  I'm going to stop it there.

21  BY MS. CRISHAM:

22  Q.   First of all, who is this man that you're talking to?

23  A.   Adam Mason.

24  Q.   Okay.  And do you know who the woman was?

25  A.   I believe she worked front desk.

1    Q.    Okay.  And so, according to this video, was Mr. Mason

2    telling you that these individuals were trespassing?

3    A.    Yes.

4    Q.    And based upon his earlier conversations with you, did he

5    indicate whether or not they'd been asked to leave?

6    A.    Yes.

7    Q.    Okay.  And what had he told you?

8    A.    That they had been asked numerous times to leave and they

9    declined.

10   Q.    Okay.  And did you then -- there's -- were you sort of

11   saying they're all good to go.  What do you mean by that?

12   A.    That all of them were good for trespass, all of them were

13   within our confines of trespassing.

14   Q.    Did they -- you understood them to have violated the

15   trespass ordinance; correct?

16   A.    Yes.

17   Q.    Okay.  So at this point, as you're going in there, did you

18   believe -- I guess, did you believe you had the basis --

19   probable cause to arrest Mr. Feazell?

20   A.    I did.

21   Q.    Okay.  And what grounds did you believe you had the basis

22   to arrest him on?

23   A.    Elusion previously and now trespassing.

24   Q.    Okay.  And so you had said earlier in that clip, I only

25   have ability to arrest Feazell for eluding.  What did you mean

1    by that?

2    A.    At the time he hadn't mentioned trespassing, that they were

3    all being trespassed.  My primary objective was to arrest

4    Feazell for elusion the night before.  Once he was told -- once

5    he told me that everyone in there was trespassing and that he

6    would like them trespassed, that then gave me the right to

7    arrest and detain anyone in there for trespassing.

8    Q.    For trespass as well, okay.

9          And was it your intention, then, to actually detain and

10   cite or whatever people -- the other people besides Mr. Feazell

11   for trespass?

12   A.    Yes.

13   Q.    I'm going to play a little bit more.

14                        (Video played.)

15   BY MS. CRISHAM:

16   Q.    When you walked into the room, did you see anyone you

17   recognized?

18   A.    Yes.

19   Q.    Who did you see?

20   A.    I recognized Mr. Feazell.

21   Q.    And how did you recognize him?

22   A.    The blond braids on the back of him.

23   Q.    Was this the same person that you had seen driving the

24   white truck the night before?

25   A.    Yes.

1    Q.    And was it also the same person in the pictures that

2    Mr. Mason had sent you?

3    A.    Yes.

4    Q.    Okay.  Was there anything about his stature that you

5    noticed?

6    A.    Yes.  He's very large.

7    Q.    Okay.  You said that your original plan had been to detain

8    and arrest Mr. Feazell for eluding and then to detain everyone

9    else for trespass.  Did that actually happen?

10   A.    No.

11   Q.    Okay.  Why not?

12   A.    Given the layout of the actual room with four exits, as

13   well as -- if you look -- if you're looking on the sides of my

14   body-worn while you're watching this video, like I said

15   previously, instead of being 10 to 15, there was approximately

16   30 to 40 people in this room.  I had about five or six officers

17   with me, some of which were still in the lobby and not actually

18   with us, uhm, made this extremely, extremely unsafe for

19   officers.  And it was almost impossible to detain everyone in

20   the room until Mr. Feazell was secured from obstructing us, as

21   well as now in the room there's about four other subjects in the

22   room.

23   Q.    Okay.  And so did you sort of pivot and decide just to

24   focus on Mr. Feazell?

25   A.    Correct.

1   Q.   Okay.  I was going to show a bit more of the video.

2                      (Video played.)

3   BY MS. CRISHAM:

4   Q.   So was any contraband found on Mr. Feazell?

5   A.   Yes.

6   Q.   What was that?

7   A.   He had a firearm on him, which he is not supposed to have

8   being that he's a felon.  He also had narcotics on him.

9   Q.   Okay.  You indicated -- you state in here -- when

10  Mr. Feazell asked you why he was being arrested, what did you

11  say?

12  A.   For elusion.

13  Q.   And did he deny that?

14  A.   He did.

15  Q.   And what did you say?

16  A.   That I saw him as well as multiple eyewitnesses.

17  Q.   And had multiple eyewitnesses actually seen Mr. Feazell

18  driving?

19  A.   No.

20  Q.   Okay.  You were the only person that had seen him?

21  A.   Correct.

22  Q.   Why did you say that?

23  A.   In order -- for a ruse.  If I could get an answer of him

24  driving, that was something I wanted.

25  Q.   Okay.  So, again, just to clarify, when you came into the

```
 1   common room that night, what did you understand that you had
 2   probable cause to do?
 3   A.    Detain -- well, first off, I had probable cause to detain
 4   everyone in there for detainment -- or for obstru- -- jeez,
 5   Louise, for trespassing, excuse me, as well as elusion from the
 6   night prior --
 7   Q.    And that's --
 8   A.    -- for Mr. Feazell.
 9   Q.    Okay.  And did you also believe you had the ability to
10   arrest him for trespass?
11   A.    Yes.
12         MS. CRISHAM:  Okay.  Your Honor, I have no further
13   questions.
14         THE COURT:  Thank you.
15      Cross-examination.
16                        (Off the record.)
17                        CROSS-EXAMINATION
18   BY MR. KENNEDY:
19   Q.    Good afternoon, Officer.
20   A.    Hello.
21   Q.    Thank you for taking the time to be here.  I know you work
22   nights, so it's probably a rough time for you.
23   A.    A little bit, yeah, but that's fine.
24   Q.    Yeah.  I'll try to be as efficient as possible.
25         I'd like to begin by talk- -- as the prosecution did, by
```

1    talking about the incident that brought you to the Onni Boren

2    hotel that night -- or the Onni Boren apartments that night.

3    A.    Yes.

4    Q.    As you said to the prosecution, you came there because

5    there was a report of someone flashing their lights, signaling

6    for help; correct?

7    A.    Like a flashlight, not the lights, but, yes.

8    Q.    And it wasn't just that report, you had been told that

9    earlier as well; right?

10   A.    Regarding what?

11   Q.    You had previously heard other reports of people flashing

12   the lights signaling for help in that apartment; correct?

13   A.    I got dispatched the call and then I went there.

14   Q.    But you also had a call with Mr. Mason where he reported

15   that as well, did he not?

16   A.    Possibly, I'm not sure.

17   Q.    Okay.  And it was clear from the reports that it was a

18   distress signal; it was believed it was a distress signal?

19   A.    Believed, correct.

20   Q.    That they thought that people might be being drugged or

21   being harmed?

22   A.    I couldn't answer that, it was just possibly a distress

23   signal.

24   Q.    But it was definitely the 39th floor, or at least a higher

25   floor; correct?

1  A.    That was unknown.  It was just seen from the outside; this

2  isn't seen from the inside.

3  Q.    Are you saying that there -- that you did not know what

4  floor it could have been?

5  A.    It was possibly on the 39th floor.  There was no like exact

6  floor number.

7  Q.    Okay.  I'd like to show you a video.

8         MR. KENNEDY:  Megan, could you pull up 100-A?

9         This is the --

10                        (Video played.)

11 BY MR. KENNEDY:

12 Q.    And that's Officer Jay; correct?

13 A.    Yes.

14 Q.    And he showed you a photo there of one of the top floors of

15 the building?

16 A.    Yes, sir.

17 Q.    And said it was very clear that it was that place?

18 A.    Yeah, from what the people believe.

19 Q.    And he told you that there had been many reports for

20 several weeks?

21 A.    Correct.

22 Q.    So at that point, you knew that it was the 39th, or a

23 higher floor, not the 7th floor?

24 A.    Correct.

25 Q.    But you didn't investigate the 39th floor right away?

1   A.   We did go up substitute floor, yes.

2   Q.   But not initially?

3   A.   No, due to me finding the females first.

4   Q.   And while you were checking on those ladies, you called for

5   other officers?

6   A.   I did.

7   Q.   And you called for the fire department?

8   A.   I did.

9   Q.   But you didn't suggest that the other officers go up to the

10  39th floor?

11  A.   Not at that time, because it was still my call.

12  Q.   And you didn't think that you could leave the women with

13  the fire department and go up and check the 39th floor, either?

14  A.   No.  It was my job to provide security for the fire

15  department.

16  Q.   You went upstairs about 30 minutes later; correct?

17  A.   I don't know.

18  Q.   Would that be fair to say, about 30 minutes later?

19  A.   Sure.  Yeah.

20  Q.   Thirty minutes is a fair amount of time if one is in acute

21  distress; correct?

22  A.   Possibly, yes.

23  Q.   That wasn't a concern for you?

24  A.   My immediate concern was the two females in front of me.

25  Q.   Now, you spoke with Mr. Mason that day; correct?

March 21, 2025    48

1    A.    Yes.

2    Q.    And he told you that there were people on the 39th floor

3    drugging women; correct?

4    A.    No.

5    Q.    I'd like to show a video, 100-D.

6                         (Video played.)

7    BY MR. KENNEDY:

8    Q.    And I apologize, I didn't move to introduce this before.

9          This is your body-worn video; right?

10   A.    Yeah.

11              MR. KENNEDY:  I would move to introduce Exhibit 100

12   into evidence.

13              MS. CRISHAM:  No objection.

14              THE COURT:  100 is admitted.

15                   (Defendant Exhibit 100-D admitted.)

16   BY MR. KENNEDY:

17   Q.    And so he told you that -- he was pointing to the 39th

18   floor for a group of individuals that he said were causing

19   problems; right?

20   A.    Yes.  He's saying they have a problem.

21   Q.    And he also called you earlier that night to talk about it,

22   did he not?

23   A.    I don't remember.

24              MR. KENNEDY:  Megan, could you pull up 113-B?

25                         (Video played.)

1    BY MR. KENNEDY:

2    Q.    This is your body cam as well?

3    A.    Yes.

4    Q.    And this is dated July 28th and 6:42 is advanced because

5    it's uniform time, correct, so it's actually 11:42?

6    A.    I'm not sure.  I would assume so, yes.  There would be no

7    reason for me to be there that early.

8    Q.    Okay.  So this was before you went to the call?

9    A.    I would assume so.

10   Q.    Okay.  So you spoke with Mr. Mason before you went to the

11   building at all?

12   A.    Correct.

13   Q.    And he initially told you that he was having problems with

14   apartment 3902; correct?

15   A.    Or he had a call for a 3902.

16   Q.    And he told you that there were men up there drugging

17   women?

18   A.    Again, I'm not hearing anywhere in here that they're

19   drugging women.

20   Q.    Do you know if he told you that the people in that unit

21   were Hispanic men?

22   A.    Unless he just said it right here.  I wasn't paying

23   attention to the descriptors here.

24              MR. KENNEDY:  Okay.  Can we play 100-H?

25                        (Video played.)

1   BY MR. KENNEDY:

2   Q.   So the front desk called you and told you there were people

3   on the 39th floor drugging people and dragging them out of the

4   unit?

5          MS. CRISHAM:  Objection, Your Honor, this

6   mischaracterizes what was said in the video.

7          THE COURT:  That was not exactly what was said in the

8   video.

9      Do you want to play it again?  Maybe I misheard.

10          MR. KENNEDY:  Okay.  Can you...

11                     (Video played.)

12          MR. KENNEDY:  Could you pause it.

13  BY MR. KENNEDY:

14  Q.   So he said there's a group of ten Hispanic males; correct?

15  A.   Yes.

16  Q.   And he said they'd bring women up and bring them down in

17  her state?

18  A.   According to what the front desk said, yes.

19  Q.   Uh-huh.  And you were pointing at Ms. Timeteo at the time?

20  A.   I believe so.

21  Q.   Okay.  So he told you that on the 39th floor, there were

22  individuals -- there were Hispanic individuals that brought

23  women up there and would bring them down in a state equivalent

24  to someone who is very intoxicated?

25  A.   Yes.

1    Q.    Okay.  And you ultimately went up to the -- and he told you

2    that it was a man named Irwin that was the main person, did he

3    not?

4    A.    I believe so, in the text messages.

5    Q.    But he also --

6    A.    Possibly in person.

7    Q.    He also told you that day, did he not?

8    A.    I don't recall.

9    Q.    Okay.  And so after you talked to the women, you did

10   ultimately go up to the 39th floor; right?

11   A.    I believe so, yes.

12   Q.    And the occupants were Hispanic; correct?

13   A.    I don't believe so, no.  I believe they were either some

14   sort of Asian or Indian.

15              MR. KENNEDY:  Megan, could you play 100-G?

16                        (Video played.)

17   BY MR. KENNEDY;

18   Q.    Those are the --

19   A.    Yes.  This is the group that I encountered.

20   Q.    That's the group that you saw?

21   A.    Yes.

22   Q.    And -- okay.  And you didn't speak with everyone in the

23   apartment, though; correct?

24   A.    No.  My partner at -- or my partner on this call may have.

25   I didn't speak with everyone directly, no.

1    Q.    But as you saw in that video, that was one person that he

2    said was in the bathroom, and you didn't bother talking to him?

3    A.    I did not personally, no.

4    Q.    Okay.  Did you inspect the whole apartment?

5    A.    I believe we did.

6    Q.    Including that room that that person was in?

7    A.    That may have been my partner, not me, but I inspected a

8    good portion of it, yes.

9    Q.    But nobody -- as far as you know, nobody spoke with that

10   person that's in that room?

11   A.    I'm assuming my partner did.

12   Q.    Okay.  Well, if I were to tell you that on the video, you

13   guys don't go into that room, I don't have a clip of that, would

14   you say that I'm wrong?

15   A.    If you were to tell me that my partner didn't talk to a

16   fourth suspect in a room, I would assume that you're probably

17   wrong.

18          MR. KENNEDY:  Okay.  I haven't clipped that whole

19   video, but if the Court would like it at some point, I'm happy

20   to do that.

21          THE WITNESS:  Unless we determined that nothing here

22   is out of crazy order, which, to me, this appears to be a family

23   of however many enjoying pizza and nothing out of the ordinary,

24   nothing's disheveled.  I did go into one of their bedrooms.

25   Nothing here seems out of place.  Nothing here seems like a

1  kidnapping or a drugging going on.  This seems like a family

2  enjoying pizza.

3  BY MR. KENNEDY:

4  Q.    Okay.  You didn't ask if any of them were Irwin, did you?

5  A.    I don't recall.

6  Q.    You didn't ask if the guy in the other room was Irwin, did

7  you?

8  A.    I do not recall.

9  Q.    And you ultimately closed the incident report for that --

10 for the girls flashing the lights -- or whoever was signaling

11 with the lights?

12 A.    This is possible, yes.

13 Q.    You essentially took their word for what happened?

14 A.    Whose word?

15 Q.    These people in this apartment.

16 A.    Yes.

17 Q.    And you moved on to investigating apartment 707?

18 A.    Correct.

19 Q.    You never went back to 3902 again?

20 A.    Not that I can recall, no.

21 Q.    So you never resolved the question of why the lights were

22 being flashed?

23 A.    My answer would have been that this would not have the been

24 the apartment involved, or if it was, it was by accident.

25 Q.    But as you said in the previous video, or as Officer Jay

1   said to you in the previous video, people had been flashing the

2   lights for several weeks; correct?

3   A.   According to another bystander; correct.

4   Q.   And you took their word for it and just moved on to the

5   next apartment?

6   A.   Took whose word for it?  These guys in the video.

7   Q.   Uh-huh.

8   A.   Correct.  Like I said, nothing seems disheveled here.

9   Nothing's out of the ordinary.

10  Q.   Okay.  And again, Mr. Feazell lived on the 7th floor;

11  right?

12  A.   If he was a resident in the apartment, yes.

13  Q.   And he's black; right?

14  A.   I would assume so.

15  Q.   He's not Hispanic?

16  A.   I am not sure.

17  Q.   But you told the young woman that you knew that it was

18  Mr. Feazell and his friends that had drugged them; correct?

19  A.   At what point, when I'm initially talking to --

20  Q.   Earlier, when you're talking to them, yes?

21  A.   On the street side?

22  Q.   Yes.

23  A.   Not that I can recall.

24          MR. KENNEDY:  Megan, can you play 100-I?

25                      (Video played.)

1    BY MR. KENNEDY:

2    Q.    So you told them that you knew that it was them?

3    A.    I'm confused on what --

4    Q.    Again, this is a shorter portion of the clip.  I can get a

5    longer portion of it, but if previous to that?

6    A.    Yes, based on information given, that it is common

7    knowledge to -- I guess the front door -- the front door staff

8    and stop there, the females are being drugged.  I did have good

9    information that females were being drugged, and I figured it

10   was those guys, yes.

11   Q.    Even though the front desk had told you that the drugging

12   was happening in 3902?

13   A.    He didn't say specifically that unit only.

14   Q.    The women didn't think they had been drugged, did they?

15   A.    I'm pretty sure shortly after this clip she admits to

16   thinking that she was drugged.  Being that they were medical

17   staff, she --

18            MR. KENNEDY:  Megan, can you play 100-K?

19                         (Video played.)

20            MR. KENNEDY:  I'm sorry, 100 -- I'm sorry, I can't

21   read that; 17:30 to 17:41.

22                         (Video played.)

23   BY MR. KENNEDY:

24   Q.    So her friend asked her, you think you've been drugged, and

25   she said no?

1   A.   She asked her extremely intoxicated friend if she thought

2   she was drugged and she said no, correct.

3   Q.   Okay.  And the other young women said that she thought that

4   those guys were fine?

5   A.   She called them nice, yes.

6   Q.   But you told them that they were bad news?

7   A.   After the information gathered, yes.

8   Q.   And you told them that you knew that they were the ones

9   drugging women?

10  A.   I had made assumptions; correct.

11  Q.   They were assumptions, you didn't know?

12  A.   Did I know without a shadow of a doubt that they were

13  drugged by those men that I saw, no.

14  Q.   You assumed?

15  A.   Correct; I made an assumption.

16  Q.   You also learned that the young woman who was extremely

17  inebriated had not eaten since breakfast that day; right?

18  A.   I don't recall, but -- I do not recall.

19            MR. KENNEDY:  Megan, could you play clip 100-Q, 73143?

20                      (Video played.)

21  BY MR. KENNEDY:

22  Q.   So the member of the fire department asked her if she was

23  eating -- drinking on an empty stomach, and she said that she

24  ate Eggs Benedict that morning for breakfast; correct?

25  A.   Correct.

1   Q.   That's what the video shows?

2   A.   Yes.

3   Q.   And that's your body camera?

4   A.   Yes.

5   Q.   And someone who hasn't eaten all day would be someone who

6   would be more inebriated ordinarily than somebody who has been

7   eating, if they drank the same amount?

8   A.   Again, I'm not a medical -- or, sorry, not again, but I'm

9   not a medical professional, I wouldn't be able to answer that

10  question.

11  Q.   So you don't think that the level of -- the amount that

12  somebody's eaten has any impact in how drunk or sober they

13  appear?

14  A.   If I ate Eggs Benedict and drank versus if another person

15  ate Eggs Benedict and drank, our intoxication levels would be

16  completely different.

17       He also doesn't say how much, one plate, two plate, like --

18  Q.   But she said for breakfast.

19  A.   Breakfast for me is at 5, so, again, I --

20  Q.   This is at -- after midnight; correct?  Again, the

21  timestamp I believe is seven hours off, so I think --

22            MS. CRISHAM:  Your Honor, I'm going to object at this

23  point to relevance.  Subject to this is whether there was

24  probable cause to arrest Mr. Feazell.

25            THE COURT:  Right.

1          And maybe you've got some theory that you're weaving here

2     that I'm not aware of, but please, to the extent possible, get

3     focused on probable cause for the two crimes at issue.

4               MR. KENNEDY:  Okay.  I will move on.  Okay.

5               THE COURT:  Thank you.

6               MR. KENNEDY:  If I can just -- my answer to the

7     relevance question is that the government has introduced the

8     idea that these young men were drugging these women.  And from

9     what I've seen, it's clear that they were told that it was

10    someone else, that they did not know that it was them.  But I'll

11    move on.  I'll move on to the next subject.

12    BY MR. KENNEDY:

13    Q.   So now I'd like to talk to you about the investigation

14    after that.  You were very intent on figuring out what happened;

15    correct?

16    A.   Yes.

17    Q.   You told Ms. Hatch that you were really trying to get to

18    the bottom of this?

19    A.   Correct.

20    Q.   You said that.

21         And you told her it was really bothering you with these

22    guys?

23    A.   Something along those lines, yes.

24    Q.   Okay.  But those two women went home -- or to a friend's

25    house that night?

1    A.    Yeah.

2    Q.    They didn't --

3                          (Cross-talking.)

4    BY MR. KENNEDY:

5    Q.    They didn't file any charges?

6    A.    I'm not sure what they decided to do.

7    Q.    You never did any subsequent investigation to this night?

8    A.    I'm sorry?

9    Q.    I'll move on.

10         At the time you left Onni Boren, you were not investigating

11   a crime, a specific crime?

12   A.    At the time I left where?

13   Q.    At the time you left Onni Boren to go to Vue?

14   A.    I was still -- no, I was not investigating the drugging, I

15   suppose.

16   Q.    There was no specific crime that you were investigating?

17   A.    Not entirely, no.

18   Q.    Okay.  But you knew that Club Vue is somewhere that you

19   wanted to go to look for these guys?

20   A.    Just checking my sector.

21   Q.    You said that it was -- there are no bars near -- that that

22   was the nearest bar in your sector?

23   A.    Worthwhile, yeah, that people would go to in a dress.

24   Q.    Okay.  And you said you spoke with the bouncer.  And she

25   was a former -- she was the head of security, a former police

1    officer?

2    A.    For Chicago.

3    Q.    And you were questioning a witness, possible?

4    A.    Excuse me?

5    Q.    She was a possible witness to your investigation that you

6    were asking questions about to?

7    A.    No.  She told me that she had denied entry to a group of

8    five to six males who were armed.

9    Q.    But you were still investigating the incident at Onni

10   Boren?

11          MS. CRISHAM:  Your Honor, objection.  The officer

12   testified that he was not investigating a crime at that point,

13   he simply wanted to find out more information.

14          MR. KENNEDY:  Okay.  Okay.

15   BY MR. KENNEDY:

16   Q.    So you didn't have your body camera on --

17          THE COURT:  And I'm not sure you need a ruling on that

18   objection.  I mean, if the question -- oh, you're saying that

19   the question assumes facts not in --

20          MS. CRISHAM:  Yes, it misstates prior testimony.

21          THE COURT:  That's sustained.

22          MR. KENNEDY:  I'll withdraw that, Your Honor.

23   BY MR. KENNEDY:

24   Q.    You didn't have your body camera on when you were speaking

25   with her?

1  A.    Activated, no.  It was on, I had it on my person, it was

2  not activated, correct.

3  Q.    It wasn't activated.  But you were questioning her trying

4  to find these guys?

5  A.    No.  She had told me that she had denied entry to five or

6  six males that were armed and drinking on the sidewalk.

7  Q.    So you went to this bar because you were looking for these

8  men?

9  A.    No.  I was going to nearby bars, looking -- yeah, okay,

10  yeah, and I was, I was looking for males, but I was also

11  checking on the nearest nightclub to me, yes.

12  Q.    So you were questioning somebody, trying to find these men?

13  A.    Yes.

14  Q.    So she was a witness?

15  A.    No.  What would she have witnessed?  If -- why would I have

16  activated my camera if she had nothing to find.  I had no

17  information.

18  Q.    Okay.  And she told you that they had gone down into the

19  parking lot; right?

20  A.    She pointed in a direction, she didn't say parking lot.

21  Q.    And, now, that parking lot is between two restaurants,

22  right, and it's down metal stairs?

23  A.    It's down metal stairs, I don't know the businesses.

24  Q.    But it's almost kind of like a blind alley; right?  Like

25  you're going down there -- you have to -- you're kind of

1   exposing yourself to go down those stairs?

2   A.    Yes.

3   Q.    And you were investigating men that she had told you she

4   believed were armed?

5   A.    Correct.

6   Q.    And you didn't think it necessary to turn your body camera

7   on before you went down there?

8   A.    For what?

9   Q.    When you were trying to find the armed men?

10  A.    It's not illegal to have a firearm.

11  Q.    Your report says that she provided photos, but today you've

12  said you didn't ask for video.  Do you know what happened with

13  that?

14  A.    My job as a patrol officer is to send the link.  If they

15  don't use the link, that's not something I can do.

16  Q.    Okay.  But we don't have any photos that she gave us?

17  A.    Again, if she didn't provide anything, then I couldn't do

18  anything about that.  Or I guess I should say, if the club

19  didn't.  It's not up to her, it would be up to the managers at

20  the club.

21  Q.    Okay.  You said when you went down into the parking lot,

22  you didn't want to turn your body camera on because you didn't

23  want to signal that you were doing that; right?

24  A.    Correct.

25  Q.    But you said you radioed in the license plate?

1    A.    Correct.

2    Q.    You radioed it in while you were down there?

3    A.    I'm not sure.

4    Q.    Okay.  But if you were to radio, you would be reaching for

5    your shoulder and it would be squawking in your ear; right?

6    A.    Squawking -- I have an earpiece, so there's no volume that

7    you'd be able to hear from the outside.

8    Q.    Okay.

9    A.    Also, to my knowledge, a police officer speaking on a radio

10   is pretty common practice; a police officer activating a body

11   camera looks very clear.

12   Q.    You said that you saw multiple people from Mr. Feazell's

13   group; right?  Right; you said several people?

14   A.    Yeah, associating themselves with him.

15   Q.    But you didn't note in your report how many you saw?

16   A.    I'm assuming not.

17   Q.    Okay.  And you testified today that there were several of

18   them.  I believe you said there were 10 or 20, I think, or maybe

19   about 10, you said; is that about right?

20   A.    Yeah; upwards.

21   Q.    But the only person that you think you were able to

22   identify was Mr. Feazell?

23   A.    Identify, no, but get descriptors of a driver, yes.

24   Q.    The only person you had any distributors of was

25   Mr. Feazell?

March 21, 2025

1    A.    Correct.

2    Q.    You saw Mr. Feazell?

3    A.    I was assuming so.

4    Q.    And you radioed in so they would do a high-risk stop of

5    this car?

6    A.    I did not.

7    Q.    Did Officer Jay ask for a high-risk stop?

8    A.    He did.

9    Q.    Okay.  But you asked for more units so they could stop the

10   car?

11   A.    Yes.

12   Q.    And when you radio and want someone to stop a car, it's

13   important that they know who they're looking for; right?

14   A.    Yeah.  Yes.

15   Q.    At one -- for instance, at one point the car -- officers

16   were sent back to the Onni Boren, right, during the chase?

17   A.    Dur- -- okay.

18   Q.    During --

19   A.    There was no chase.

20   Q.    -- some officers were dispatched to the Onni Boren in case

21   the truck went back there?

22   A.    I would have to look at the report, but I would assume so,

23   yes.

24   Q.    Okay.  And that's because you thought that maybe -- or

25   Officer Jay thought that maybe they would go back there; right?

1    A.    Yes, that would be the intention.

2    Q.    And if they went back there and they weren't in the truck

3    anymore, the other officers would want to know who was driving

4    the truck -- or who had been driving the truck; right?

5    A.    The officers would want to know who's driving the truck,

6    yes.

7    Q.    So you would want to describe who was driving the truck so

8    that they would know who had been driving?

9    A.    Correct.

10   Q.    But you didn't describe him?

11   A.    No.

12   Q.    You didn't say that he had a large build?

13   A.    No.

14   Q.    Or braids or was African American?

15   A.    No.

16   Q.    You didn't radio any of that to the other officers that

17   were going to be involved in the chase or in trying to stop this

18   vehicle?

19   A.    They would find that out if the car had pulled over.  A

20   descriptor of the driver that is not eluding is not as important

21   as getting a descriptor of a license plate and the truck that,

22   again, is not eluding.

23       Once the car begins eluding, yeah, descriptors are

24   important, but I was not there for that.

25   Q.    But you heard over the radio that they were eluding?

1    A.    I did.

2    Q.    At that point, did you chime in and say the driver is

3    so-and-so, or has such-and-such characteristics?

4    A.    No.

5    Q.    Okay.  You said that -- no, excuse me, skip it.

6          I'll move on to the chase itself.  You said that you

7    weren't personally involved in the chase; right?

8    A.    Again, there was no pursuit authorized, no pursuit is

9    engaged.

10   Q.    You weren't involved in following the truck.  You were

11   trying to catch up to them, but you hadn't caught up to them;

12   right?

13   A.    Wrong.  On the CAD, you can see that I radio in that I'm

14   behind Tanner Jay.

15   Q.    So you were part of the whole chase?

16   A.    I was second or third car.  And again, there was not a

17   chase.

18         I'm sorry, it's just for Seattle, pursuits and chases are

19   very important.  I'm not going to --

20   Q.    I understand.  Okay.

21   A.    -- say that I'm chasing when I'm not.

22   Q.    Did your body cam stay on for the entire pursuit of the

23   vehicle?

24   A.    There was no pursuit.

25   Q.    Okay.  Or what word would you choose -- would you like me

1    to use?  I'm happy to use whatever you want me to.  I'm sorry, I

2    tried to use pursuit to make you feel better.

3    A.    Was my body cam on while we were behind the vehicle?

4    Q.    Uh-huh.

5    A.    I could not answer.  I would assume so.

6    Q.    Because that's something you normally do?

7    A.    No, that's not something we would normally do.  Only reason

8    it was on at that time is because I knew the vehicle was in

9    question.  This was another vehicle.  I wouldn't activate until

10   I was out of my vehicle or the vehicle had stopped.

11   Q.    You mentioned that you never heard any description of the

12   driver as Hispanic with short hair?

13   A.    Correct.

14   Q.    You have a radio on your person, though; right?

15   A.    Correct.

16   Q.    And you have -- you said you had an earpiece?

17   A.    Correct.

18   Q.    So if somebody had radioed Hispanic male, short hair, that

19   would have come through your earpiece?

20   A.    Correct.

21   Q.    But that's not captured on your body cam, it's not in your

22   report?

23   A.    I would assume not.

24   Q.    And if you heard that there was a driver that was distinct

25   from the driver that you remembered, and you knew that they were

1   fleeing police, you would want to correct that; right?

2   A.    No.

3   Q.    So if they're looking for a Hispanic male with short hair,

4   you don't think that it matters to let them know actually the

5   driver's a large black man with dreadlocks?

6   A.    If an officer says he saw a Hispanic male, I'm not going to

7   tell the officer he's inherently wrong.

8   Q.    But you didn't think it was important to add your --

9   A.    I didn't hear it.

10  Q.    -- observation?

11        Your reports -- you know Officer Qualls; right?

12  A.    Yes.

13  Q.    And you know that he was involved in the pursuit -- I'm

14  sorry.

15  A.    Following -- the following, yes.

16  Q.    In following the vehicle, with the lights on, trying to

17  stop the vehicle; as you say, it was eluding?

18  A.    Yes.

19  Q.    He's not a liar to your knowledge?

20  A.    I wouldn't be able to answer that.

21  Q.    You don't think he's somebody that fabricates things?

22  A.    No.

23  Q.    You think -- you said most likely he was wrong when the

24  prosecution asked you about that, about his observation --

25  A.    In my opinion, yes.

1    Q.    -- that the driver was Hispanic?

2          But he's -- excuse me.

3          But you -- you said you got together with the other

4    officers that had been involved once you got back to the Onni

5    Boren; right?

6    A.    After the elusion?

7    Q.    Uh-huh.

8    A.    I had radioed in with 'em, yes.  We also have chat on our

9    CAD system.

10   Q.    And did you discuss the driver at that point?

11   A.    No.

12   Q.    You didn't mention that it was a black male with -- that

13   was large in stature with dreadlocks?

14   A.    Not that I recall.

15   Q.    Presumably, Officer Qualls would have been involved in that

16   conversation, too; right?

17   A.    I would assume so, yes.

18   Q.    And it's important to identify who is driving the car in a

19   case such as this; right?

20   A.    Yes.

21   Q.    And that's why Officer Qualls radioed in his observation of

22   the driver?

23   A.    Correct.

24   Q.    And that's why Officer Jay asked him at another point if he

25   got a good look at the driver?

March 21, 2025                70

1   A.    I'm not here to speak for them.

2   Q.    Okay.  But that would be why -- if Officer Jay asked that

3   question, that would be why he would have done that, because

4   it's important to know who is driving the car -- the truck?

5   A.    Sure, I would assume so.

6   Q.    But you never felt it necessary to update anybody else on

7   your observation of who was driving the truck?

8   A.    I guess not.

9   Q.    I want to go on to talking about your report specifically.

10  A.    Okay.

11  Q.    It's important that your reports are complete and accurate;

12  right?

13  A.    Yes.

14  Q.    And on this matter, you were the -- the CAD report says you

15  were the report officer?

16  A.    Okay.

17  Q.    Does that mean that you were the primary drafter of the

18  report?

19  A.    Yes, usually.

20  Q.    So that would mean that it was incumbent on you to speak

21  with the other officers that had been involved to get their take

22  on what happened?

23  A.    Not always, no.

24  Q.    Not always, but it would be useful?

25  A.    It would be useful.  But officers also have

1  responsibilities.  The act of tailing down five or six officers

2  while we're still answering dispatches, nearly impossible.

3  That's why we have to go off the CAD notes.

4  Q.    Although it's important that you're clear, accurate, and

5  complete in your report, your report did not describe the

6  driver; correct?

7  A.    I would assume not.

8  Q.    Your report merely said, I observed Feazell to be driving?

9  A.    Correct.

10 Q.    And that was drafted subsequent to Mr. Mason providing you

11 photos of Mr. Feazell?

12 A.    That was -- the report was drafted before giving -- getting

13 photos?

14 Q.    After.

15 A.    I'm not sure, I would have to check the timestamp of my

16 report.

17       Also, the report getting put into our system has to go

18 through a few layers of supervisors first.  When I click submit

19 versus when my sergeant and lieutenant and so on passes it

20 forward is different.

21 Q.    If the report has a timestamp that says report, date, time,

22 is that the time that you start writing the report?

23 A.    Yes.

24 Q.    And then there's a timestamp at the bottom that says,

25 reporting officer signature date.  That would be when you

1    finished writing the report?

2    A.    Yes.

3    Q.    And then there's a timestamp at the bottom right that says

4    supervisor signature date?

5    A.    Yeah.  So that would be then passing through the layers.

6    Q.    All right.  So you began writing this report -- I'll point

7    you to government's Exhibit 4 at page 4-004.  It says you began

8    writing this report on the 28th at 19:49, that's 7:49; right?

9    A.    Okay.

10   Q.    And it says that you completed it at 21:58, which is 9:58?

11   A.    Okay.

12   Q.    Okay.

13         And turning back to the text conversation with Mr. Mason,

14   which is Government's Exhibit 2, he sent you those photos at

15   approximately 8:10 p.m.; correct?  And if you look at page --

16   page 7.

17   A.    Yes.

18   Q.    So at the time that you finished the report, you had

19   already been given the photos from Mr. Mason?

20   A.    Yes, according to this, yes.

21   Q.    You had never met Mr. Feazell before this night?

22   A.    Not that I believe, no.

23   Q.    So you didn't know prior to this night what Doneale Feazell

24   looked like?

25   A.    No.

1  Q.   To you, prior to writing this report, the statement of, I

2  saw Doneale Feazell to be driving, doesn't provide any color?

3  A.    Incorrect.  According to you and the timestamps, I just

4  received photos before the report.  It was also given to us the

5  identity of him previous to that report as well.

6          THE COURT:  Counsel, I think the government

7  established that at the time he saw Mr. Feazell, he didn't know

8  it was Mr. Feazell.  But when he was writing his report, he knew

9  that it was Mr. Feazell who he saw and that's why he typed that.

10          MR. KENNEDY:  Okay.

11  BY MR. KENNEDY:

12  Q.   There were other observations made of people driving the

13  car, the truck?

14  A.    Yes?

15  Q.   Mr. Mason sent you photos of someone that was driving the

16  truck?

17  A.    Oh, correct, yes.

18  Q.   And you put in your report that in those photos,

19  Mr. Feazell was being dropped off at the Onni Boren the next

20  day?

21  A.    Yes.

22  Q.   If you look at Exhibit 3 again and go back to page --

23  A.    I'm sorry, exhibit?

24          MS. CRISHAM:  Andy, can I grab my binder?

25          MR. KENNEDY:  I'm sorry.

1    BY MR. KENNEDY:

2    Q.    If you look at pages 2 through 4.

3    A.    On Exhibit 3, I don't have anything.

4    Q.    What's that?

5    A.    I'm sorry, I'm questioning what exhibit you're on.

6    Q.    Government's Exhibit 2.

7    A.    Okay.  Exhibit 2 on what pages now?

8    Q.    Pages 2 through 4.

9         MS. CRISHAM:  Got the wrong one.  Sorry.

10   A.    Yes, sir.

11   BY MR. KENNEDY:

12   Q.    Those are the photos supposedly of --

13                       (Off the record.)

14   BY MR. KENNEDY:

15   Q.    Those are the photos of Mr. Hutchinson that the -- that

16   Mr. Mason sent you; right?

17   A.    Yes.  Mr. Kayshawn Hutchinson.

18   Q.    And there's no indication there that he said that he was

19   dropping off Doneale Feazell?

20   A.    No.

21   Q.    He just says, I saw the white truck came, it left very

22   quickly?

23   A.    Correct.

24   Q.    And he sent you the photos?

25   A.    Correct.

1    Q.    But you put in your report that he dropped off Doneale

2    Feazell?

3    A.    Yes.

4    Q.    And he says, Whenever it shows up again, I'll call 911?

5    A.    Yes.

6    Q.    I'd like to move on to the issue of the trespassing.

7          You said you had been speaking with Mr. Mason throughout

8    the day; correct?

9    A.    Yeah, throughout my shift.

10   Q.    By text and on the phone?

11   A.    Yes.

12   Q.    Did you activate your body camera when you were speaking

13   with him on the phone?

14   A.    No.

15   Q.    At that time he was a witness; correct?

16   A.    Yes.

17   Q.    So under Seattle Police policy, you should have activated

18   your body cam?

19   A.    No.  I can call people and ask for information, that

20   doesn't need to be activated.  There was nothing pertinent, it

21   was more of what I'm looking for.

22   Q.    I'd like to point to Defense Exhibit 15 -- 115, I'm sorry.

23         Do you recognize this document, Defense Exhibit 115?

24   A.    Appears to be from the Seattle Police Department police

25   manual -- or policy manual.

 1   Q.   This is the policy on when to activate your body camera --

 2   A.   Correct.

 3   Q.   -- among other things?

 4        And if you look at page --

 5            MR. KENNEDY:  I would move for Exhibit 115 to be

 6   introduced into evidence.

 7            MS. CRISHAM:  No objection.

 8            THE COURT:  115's --

 9                (Defendant Exhibit 115 admitted.)

10   BY MR. KENNEDY:

11   Q.   Page 4 --

12            THE COURT:  115's admitted.

13   BY MR. KENNEDY:

14   Q.   Page 4 --

15            MR. KENNEDY:  I'm sorry, Your Honor.

16            THE COURT:  You've got to let me rule.

17            MR. KENNEDY:  I apologize, Your Honor.

18   BY MR. KENNEDY:

19   Q.   Page 4 says, When sworn employees record activity --

20            THE COURT REPORTER:  I'm sorry, can you please start

21   over?

22            MR. KENNEDY:  Okay.  I'm sorry.

23   BY MR. KENNEDY:

24   Q.   Page 4 says, When sworn employees record activity; right?

25   A.   Yes.  I'm seeing.

1    Q.    And among the things there, one is vehicle eluding/pursuits

2    at the very bottom?

3    A.    Yes.

4    Q.    And if you go to the next page, it says, Questioning

5    victims, suspects, or witnesses; correct?

6    A.    I'm not seeing the next page, but, yes.

7              MR. KENNEDY:  Oh, Megan, can you go to...

8    A.    I'm tracking.

9    BY MR. KENNEDY:

10   Q.    Okay.  So under the Seattle Police policies, you are

11   supposed to activate your body camera when you're engaged in an

12   eluding and when you're questioning witnesses?

13   A.    Yes.

14   Q.    And you've said that Mr. Mason was a witness at this point?

15   A.    For the night prior; correct.

16   Q.    But you didn't turn your body camera on?

17   A.    It was the following day, there was no imminent crime

18   happening.

19   Q.    Does it say that there must be an imminent crime?

20   A.    No, but if I'm making a call just to get basic information,

21   that doesn't usually involve a police matter, basic information

22   of me asking him for things that has no investigative, like,

23   criteria.  I'm asking him for a favor.

24   Q.    You said that Mr. Mason noted that he had never met

25   Mr. Feazell's relative that he was living with, right, except

1    for the day of signing?

2    A.    Correct.

3    Q.    But Mr. Mason also told you that he'd only worked there for

4    a week and a half; right?

5    A.    I believe so.

6    Q.    And at one point, he told you that he wouldn't recognize

7    anybody in the building if a resident came up?

8    A.    I would have to see that footage.

9    Q.    And Mr. Mason called to report the trespass after speaking

10   with you; right?

11   A.    Yes, I directed him to.

12   Q.    You told him to call 911?

13   A.    Correct.

14   Q.    And you told him to keep Mr. Feazell and his friends there;

15   right?

16   A.    Not what I said.

17   Q.    It's not?

18   A.    I said, Don't spook him.

19   Q.    Go back to Government's Exhibit 2, page 13.

20   A.    Do I say, Keep Mr. Feazell and his friends there?  No, that

21   is not what I said.  I said, Keep him there, don't spook them.

22   Q.    You said, Keep him there?

23   A.    Correct.

24   Q.    Okay.  I'd like to go back to the question that I was

25   asking you before.

1          MR. KENNEDY:  Megan, can you play 100-O?

2                    (Video played.)

3   BY MR. KENNEDY:

4   Q.   So he told you if he saw a resident, he wouldn't know who

5   they were?

6   A.   Yeah.

7   Q.   Okay.  You don't know what directive the folks at the Onni

8   Boren gave Mr. Feazell and his friends?  You don't know

9   specifically what they told them?

10  A.   Correct.

11  Q.   All you say is that they said they were refusing to leave?

12  A.   Correct.

13  Q.   You never personally told them they were there unlawfully

14  before that point?

15  A.   No.

16  Q.   You don't know of any other police officers that told them

17  that they were there unlawfully?

18  A.   Not to my knowledge, no.

19  Q.   You were aware that Mr. Feazell lived in that building?

20  A.   No.

21  Q.   You went to room 707 to find him?

22  A.   Correct.

23  Q.   Because that was his apartment?

24  A.   That's where he was supposed to be, not his apartment.

25  Q.   You said that you were misled about how many occupants were

1    in the room; right?

2    A.    In the common space.

3    Q.    That you thought that there would be five to ten and there

4    turned out to be 30 to 40?

5    A.    Correct.

6    Q.    I'd like you to direct you to your report, page 13;

7    Government's Exhibit 4, page 13.

8    A.    I'm sorry, 14?

9    Q.    Page 13.

10   A.    Page 13.

11   Q.    Government Exhibit 4, page 13.

12         And near the bottom, in all caps, it says, Formally

13   trespassed 20 to 30 people?

14   A.    Correct.

15   Q.    So you had been told that there were 20 to 30 people there,

16   not five to ten?

17   A.    Correct.  Again, I didn't say five to ten, I said 10 to 15.

18   Q.    10 to 15.

19         When you arrived at the Onni Boren, you said you were going

20   to trespass everyone; right?

21   A.    Yes.

22   Q.    In your parlance, when you say "trespass someone" --

23   A.    Uh-huh.

24   Q.    -- does that mean arrest them?

25   A.    Arrest, no; detain, possibly.

1    Q.    Or does it mean tell them they can't come back?

2    A.    It depends.

3    Q.    There were other officers there who had not entered the

4    common room yet who warned people not to come back?

5    A.    Okay.

6    Q.    They wouldn't have known how many people were in the

7    common; right?

8    A.    I can't speak for them.

9          MR. KENNEDY:  Megan, can you play -- it's previously

10   been introduced as Exhibits 1 through 3 of the response.  Can

11   you play Exhibit 107?

12                       (Video played.)

13   BY MR. KENNEDY:

14   Q.    So he told them they were -- that's your -- I assume that's

15   your sergeant?

16   A.    He's a sergeant at my precinct, yes.

17   Q.    Okay.  And he told them they're trespassed from this

18   building?

19   A.    Correct.

20   Q.    And he told them, if they come back, they'll be arrested?

21   A.    Correct.

22   Q.    Okay.  When you ultimately had the group down to a smaller

23   number, you didn't frisk and arrest everyone in the room; right?

24   In the video that she showed, were there only about five people

25   in the room?

1    A.    We did frisk everyone; multiple arrests.  Almost everyone

2    in that room was arrested that night, except for one.

3          In fact, in that video, you can hear my sergeant, that same

4    man, saying we're going to frisk everyone.

5    Q.    I'll point you to page 16 of Exhibit 4.  This is your

6    report.  And that lists four people who were arrested; right?

7    A.    Based on this report, yes.

8    Q.    And that's your report that you wrote?

9    A.    This is.

10   Q.    So it wasn't everybody except for one, it was four people?

11   A.    Yes.

12   Q.    And none of them were arrested for trespassing?

13   A.    No.

14   Q.    Okay.  You said that you wanted to get the answers to your

15   questions; right?

16   A.    Yes.

17   Q.    But you never found out who drugged the women?

18   A.    It was never concluded that they were drugged.  They didn't

19   go to the hospital.

20   Q.    Okay.  You never -- so you never answered the questions

21   that you had?

22   A.    I answered the questions I had, correct.

23          MR. KENNEDY:  I think that's all I have right now.

24   Thank you.

25          THE COURT:  Thank you.

1    Redirect?

2         MS. CRISHAM:  No redirect, Your Honor.

3         THE COURT:  Okay.  I do have a couple questions for

4    you, Officer.

5         THE WITNESS:  Yes, sir.

6                          EXAMINATION

7    BY THE COURT:

8    Q.    Looking at Government's Exhibit 2, if you turn to pages 2

9    and 3, you'll see some photos.

10   A.    Yes, sir.

11   Q.    When you saw these photos, did you recognize the person

12   with the braids as Mr. Feazell, or the person you saw in the

13   truck driving the truck?

14   A.    In the second photo?

15   Q.    Let me just make sure we're looking at the same thing.

16   A.    This one, Your Honor.

17   Q.    No, I'm looking at page -- at the bottom it should be

18   002-002?

19   A.    This photo?

20   Q.    That one.  And then if you turn the page --

21   A.    Correct.

22   Q.    -- to 002-003, there are three more photos.

23   A.    So the photo of the black shirt, heavier set male?

24   Q.    Yes.

25   A.    That would be Kayshawn Hutchinson.  He was arrested that

1  night.

2  Q.   Okay.  But did you look at these photos when they were sent

3  to you?

4  A.   I did.

5  Q.   Okay.  And if you turn to page 002-009 --

6  A.   Yes, sir.

7  Q.   -- you asked, What does he look like, Afro, braids?  My

8  question for you is, where does the notion of braids come from?

9  Why were you thinking about braids?

10  A.   Because that's what I saw on the very first night across

11  the street from Vue --

12  Q.   Okay.

13  A.   -- was a larger statured male with dread braids.

14  Q.   So it wasn't just these photos from before?

15  A.   No.  My initial was not based on these photos.

16  Q.   Okay.

17  A.   But as -- in 002-003, you can see the blond braids.

18  Q.   Okay.  When you moved to 002-010 and also -011, I believe

19  you testified that you recognized him because of the braids and

20  also because of the stature --

21  A.   Yes, sir.

22  Q.   -- correct?

23       So I just want to be clear on this, when you say "stature,"

24  what do you mean?  And what about any of these photos depicts

25  his stature?

1    A.    The stature in these photos, I had sized up -- in 002-011,

2    he's sitting much further back than the female sitting next to

3    him.  He's also sitting at a very big slump or slouch.  And,

4    Your Honor, as I -- I didn't go into detail, but I recognized

5    him as I was one of the bigger officers, a part of the arrest

6    party, I come in around like six-two, six-three, and I noted

7    when I saw Mr. Feazell, he was much, much larger than me.  It

8    was someone that you couldn't mistake.

9    Q.    Right.

10        I'm just asking what about these photos.  And let's just

11   take a look at the ones on -011, what about these photos, and it

12   may be obvious, but I just want to get it on the record, what

13   about these photos make him look large in stature to you?  And

14   you mentioned his slouching?

15   A.    Just that his seating position, he has, I would say, four

16   or five inches further back than the female sitting next to him,

17   as well he's slouched and still much taller than her.

18   Q.    And how did you know how large she was?

19   A.    I didn't, I'm just basing it off an average size female.

20   Q.    Okay.  I want to turn to the issue of probable cause for --

21   for trespass.

22        Okay.  I don't have the exact text in front of me, but just

23   paraphrasing, when you're engaged in an exchange with Mr. Mason

24   outside the Onni apartment building, you ask whether they're

25   trespassing, and his response was something like, everyone but

1    Feazell is a guest, or something like that, except he has a fake

2    name.  Then you respond, so they're all trespassing?  And he

3    says, Yes.

4        So my question is, when he -- when he talks about Feazell

5    possibly being in a different circumstance than the other folks

6    in there, why didn't you question further about Feazell's right

7    to be in the building?

8    A.   It was also given knowledge to officers that the common

9    rooms were closed off for the night.  There's a curfew of those

10   common rooms being used.  And this was given -- this was

11   information given on the first night that the common spaces that

12   people have been complaining about, Mr. Feazell and his presumed

13   association, uhm, they're in the common spaces past that curfew.

14   Q.   Okay.  And when were you told that they were there past

15   curfew?

16   A.   I believe that night.

17   Q.   That night.

18        By Mr. Mason?

19   A.   Yes.  And the staff member that was with him.

20        THE COURT:  Okay.  Thank you.

21   I don't have any further questions.

22   Does counsel have any follow-up?

23        MS. CRISHAM:  Just real quick, to clarify.

24   ///

25   ///

```
 1                        REDIRECT EXAMINATION

 2   BY MS. CRISHAM:

 3   Q.    If you could look at Exhibit 2, page 12.

 4         This is a text from Mr. Mason saying that on our system, it

 5   says his last name is Lamont.  It isn't true, though, that's his

 6   middle name, and it says resident's brother?

 7   A.    Yes.

 8   Q.    Okay.  Did this indicate that Mr. Feazell was a resident or

 9   that he was simply listed as the brother of the person who

10   actually was on the lease?

11   A.    It just says that it's his brother.

12   Q.    And did --

13   A.    It's her brother, excuse me.

14   Q.    And did Mr. Mason tell you who the tenant actually was?

15   A.    I believe so.  He sends me a picture of that.

16   Q.    And was that on page 8 of Exhibit 2?

17   A.    Yes, ma'am.

18         MS. CRISHAM:  Okay.  No further questions.

19         MR. KENNEDY:  I have just a couple quick questions.

20                        RECROSS-EXAMINATION

21   BY MR. KENNEDY:

22   Q.    You told Judge Chun that part of the reason that you

23   thought they were trespassing is that they were there past

24   hours; correct?

25   A.    Yes.
```

1    Q.    There were no -- the door was not locked, was it?

2    A.    No.

3    Q.    There were no hours posted on the door?

4    A.    I'm not sure.

5    Q.    Do you recall seeing any sort of signage?

6    A.    I do not recall.

7    Q.    Now, I know that before you said you didn't believe that

8    you had spoken with Mr. Mason prior to going to the Onni Boren

9    that night.  Would it surprise you if Ms. -- if a clip that I

10   had of that conversation included Mr. Mason telling you that he

11   made, quote, unquote, a threat to leave, but they don't know

12   that?

13   A.    I'm sorry, can you repeat that?

14   Q.    Would it surprise you if Mr. Mason had told -- if I told

15   you that Mr. Mason had told you earlier on the night of the

16   28th, really, it's a threat to leave, but they don't know that?

17              MS. CRISHAM:  Objection, Your Honor, confusing.

18              MR. KENNEDY:  I'll play the video.

19              MS. CRISHAM:  Okay.

20              MR. KENNEDY:  Can I play 113-C?

21                          (Video played.)

22   BY MR. KENNEDY:

23   Q.    Okay.  So that's what he said to you; correct?

24   A.    Yeah.  If you play it before or after, it's because he's

25   afraid because they're armed.

1    Q.   I thought you didn't remember that conversation?

2    A.   Based on this recollection, I do now.

3    Q.   Okay.  The Onni Boren shares space with the Level hotel;

4    right?

5    A.   I'm not sure.

6    Q.   You testified earlier that it was an apartment building and

7    a hotel?

8    A.   Yeah, but I'm not sure if the hotel guests had the same

9    amenities as the apartment guests --

10   Q.   Okay.  You don't --

11   A.   -- or vice versa.

12   Q.   Okay.  You don't recall asking any- --

13        THE COURT REPORTER:  I'm sorry.

14        MR. KENNEDY:  Excuse me.

15        THE COURT REPORTER:  One at a time.

16        MR. KENNEDY:  I'm sorry.  I'm sorry.

17   BY MR. KENNEDY:

18   Q.   You didn't ask anybody in that room if they were a resident

19   of the building?

20   A.   No.  I was told by staff they weren't.

21   Q.   You didn't ask anybody if they were staying at the hotel?

22   A.   No.

23        MR. KENNEDY:  Thank you.

24        No further questions.

25        THE COURT:  Thank you very much.

1          Does the government have any more questions?

2              MS. CRISHAM:  No.  Thank you, Your Honor.

3              THE COURT:  Sir, you may step down and be excused.

4              THE WITNESS:  Thank you.

5              THE COURT:  Counsel, we'll proceed to argument.

6              MR. KENNEDY:  Police did not have probable cause to

7      detain and search Mr. Feazell for eluding, trespass, or any

8      other crime on the night of July 28th.  He did not commit any of

9      those crimes and was not observed committing any of them.  And

10     the uncontroverted facts establish that.  And unfortunately,

11     Officer Malo's account is incredible.  The search was improper

12     and the firearm should be suppressed.

13         Now, it's understandable that one might be reluctant to

14     suppress the firearm.  There's a little question that

15     Mr. Feazell possessed it, and the government's correct that

16     someone drove the car away from the police that night; however,

17     that person was not Mr. Feazell.

18             THE COURT:  The possession of the firearm bears

19     absolutely no relevance to my analysis.

20             MR. KENNEDY:  I understand.

21             THE COURT:  Okay.

22             MR. KENNEDY:  I'm sorry.

23         The reason that we have the exclusionary rule, though, is

24     to keep the law abiding from being harassed by the police, as

25     Your Honor said, that whether or not he committed the ultimate

1    crime is irrelevant for purposes of the exclusionary rule.

2        As far as eluding, I'd point out that there was no crime to

3    be investigated.  As Officer Malo stated, they hadn't -- there

4    was no specific crime they were looking into.  The women left,

5    they did not file a report, they did not get tested for being

6    drugged.  There was nothing going on there.

7        As I tried to point out through the video, I believe that I

8    might have not had the full clips that I needed; however, in the

9    conversations that Mr. Mason had with Officer Malo, and the

10   conversations that he had at the Onni Boren, he did specifically

11   tell them that it was 3902, and it was Irwin who was drugging

12   women, not 707.

13       And if you look at the government's exhibit, the text

14   message, the very first thing he's talking about is Irwin and he

15   --

16           THE COURT:  So are you saying that for the crime of

17   eluding, there has to be some sort of predicate crime or --

18           MR. KENNEDY:  No, I'm not.  I'm establishing that I

19   believe that the police were fixated on Mr. Feazell.

20           THE COURT:  Okay.

21           MR. KENNEDY:  And that they were erroneous to do so.

22       Also, I think it's important to note that Officer Malo

23   didn't follow protocol.  He didn't activate his dash cam when he

24   investigated and spoke with the bouncer at the bar, he didn't

25   activate his dash camera when he went down what would presumably

1   be a dangerous stairway to confront who he believed were two

2   armed men.  He didn't have his body cam on when -- during the

3   chase or pursuit or following the vehicle, whatever he wants to

4   call it.  He didn't have his body cam on when Officer Qualls

5   radioed in that it was a Hispanic male.

6        Officer Malo concluded, based on conversations with Adam

7   Mason, that Mr. Feazell was the leader of this group.  He said

8   that he really wanted to get these guys, and so he put all -- he

9   connected all the dots in his mind and determined that

10  Mr. Feazell was the one driving the car.

11       And I think it's most noteworthy that --

12            THE COURT:  I'm sorry, I'm sorry, who said that he

13  really wanted to get these guys?

14            MR. KENNEDY:  Officer Malo did.

15            THE COURT:  When did he say that?

16            MR. KENNEDY:  He said that, uhm -- hold on, I can -- I

17  played the video for him where he said that -- or maybe I didn't

18  say [sic] the video, I asked him it and he confirmed it, but I

19  can play that video if you'd like me to.

20            THE COURT:  Well, if he doesn't say it on the video, I

21  don't need to see it.

22            MR. KENNEDY:  Oh, he doesn't say it on the video.  He

23  says he really wants to get to the bottom of this and -- if

24  you'd like me to play it.

25            THE COURT:  Does he say, I really want to get these

1   guys?  What's the context?

2        MR. KENNEDY:  Hold on.

3      He says he was really trying to get to the bottom of this

4   and it was really bothering him with them when he was speaking

5   with Lindsy Hatch.

6        THE COURT:  Okay.

7        MR. KENNEDY:  Okay.  So I believe Officer Malo

8   believed that Mr. Feazell had drugged these women and decided to

9   pursue Mr. Feazell for that.

10     And I think that it's particularly significant that his

11  report doesn't describe Mr. Feazell at all.  He didn't describe

12  Mr. Feazell at all over the radio.  Mr. Feazell is a very

13  distinct looking individual.  And when you have other officers

14  following a vehicle that you might want to --

15       THE COURT:  Well, his report doesn't describe him, but

16  I think it's undisputed that by the time he wrote his report, he

17  knew what he looked like and so he could have -- I mean, he had

18  the option to write a detailed description of Mr. Feazell at

19  that point.

20       MR. KENNEDY:  He could have, but he didn't.

21       THE COURT:  He didn't, even though he knew the details

22  of Mr. Feazell's appearance.

23       MR. KENNEDY:  However, I believe it's clear that his

24  first description of Mr. Feazell as the driver, the first time

25  that he identified Mr. Feazell as the driver, was after Adam

1    Mason told him that Mr. Feazell was the leader of the group.

2         Before he saw the photo, he asked a question of Mr. Mason,

3    What does the driver look like?  What does the leader look like?

4    Afro, braids.  He led with Afro because he had seen a man with

5    an Afro driving the car.  That was the first person that he saw

6    -- the only person that, I believe, he actually saw driving the

7    car.

8              MS. CRISHAM:  Objection, Your Honor.  That was not

9    what the testimony was.

10             THE COURT:  You'll have your chance to respond.

11             MS. CRISHAM:  Okay.  Thank you.

12             MR. KENNEDY:  Okay.  Officer Malo did not -- Officer

13   Malo tried to tell Mr. Feazell that there were multiple people

14   that had observed him driving the car, but there weren't.

15   He said that was a ruse.  However, even if it was, Mr. Feazell

16   didn't fall for it, but he wouldn't have because he wasn't

17   driving the car.

18        And I do think that Officer Malo has indicated at many

19   points that he did not accurately remember what happened.  He

20   didn't remember his conversation with Adam Mason from earlier

21   that night, where he set up this whole incident -- or this whole

22   operation to go after the people in the hotel.  He didn't, uhm,

23   remember the number of people that were in the room.  It just

24   does not seem that his recollection is accurate.

25        And the fact that he told Mr. Feazell that multiple people

1    saw him driving I don't -- I don't believe was just a ruse,

2    because he did try to -- he was confused about what had

3    happened.  He did not observe Mr. Feazell driving.  If he had,

4    it should have been on his body camera, it was not.  It was not

5    on his body camera during the chase.  He would have heard on his

6    radio a description that the driver was Hispanic.  He did not

7    correct that in any way.  He did not -- he would have spoken,

8    presumably, with the other officers after the chase.  The other

9    officers asked, What did the driver looked like, because they

10   cared about it.  And he never told them, oh, it's a large black

11   man with dreads.

12      The only description of the driver that we have is his

13   conclusory statement in his report that it was Doneale Feazell.

14   And I don't believe that that's enough to establish that he

15   actually saw the driver and understood who it was.

16         THE COURT:  And does an evidentiary standard apply to

17   that, if I make a finding on that, is it preponderance of the

18   evidence.

19         MR. KENNEDY:  I believe so, yes.

20         THE COURT:  Okay.

21         MR. KENNEDY:  The government calls it bizarre that I

22   question why Officer Malo didn't get a warrant.  I personally

23   don't think it's bizarre.  I think what's bizarre is that during

24   the 24 hours after he supposedly observed Mr. Feazell driving,

25   he didn't do a follow-up investigation.  He didn't call

1   Mr. Feazell's probation officer.  He didn't go to the police to

2   get a warrant -- or go to the court to get a warrant, which I

3   understand he doesn't have to, but it's still an important part

4   of our procedure that if he legitimately believe this was a

5   crime, I think he should have done.  I think the fact that he

6   didn't try to get a warrant indicates that perhaps he had some

7   questions.  If he had tried to get a warrant and didn't put in

8   the description of the driver as a Hispanic driver, we would

9   probably be back here with a *Franks* hearing instead.  I think

10  that it is significant that he didn't try to get a warrant, that

11  he didn't tray to figure this out.  He only talked to Adam Mason

12  about Mr. Feazell.

13      As far as trespassing, there's no indication that anyone

14  was ever formally warned that they were not legally allowed to

15  be there.  In fact, several of them were.  Mr. Feazell was a

16  resident of the building.  Even if the Court agrees with what

17  the -- what Mr. Mason says, that Mr. Feazell himself, because he

18  was only a guest of a resident, was not allowed to be there, the

19  fact is that there were other inhabitants of the room who were

20  guests of the hotel or the apartment building.

21          THE COURT:  Is that a legal requirement that there be

22  a warning?

23          MR. KENNEDY:  Well, the legal requirement is that you

24  have to be there unlawfully.

25          THE COURT:  Okay.

1          MR. KENNEDY:  And all we know is that they were asked

2     to leave.  If you ask -- or asked to leave and refused, that

3     could mean many things.  It doesn't mean that somebody

4     necessarily says if you leave, you're not allowed to be here,

5     someone could say.

6          THE COURT:  My only question is, to have probable

7     cause to arrest for trespass, do you just need the trespass or

8     do you need something more?

9          MR. KENNEDY:  I was not able to find case law that

10    specifically saying that you needed a warning.  Personally, I

11    would expect that you would because it seems very surprising

12    that you could go into someone's apartment building where they

13    live and just because one person says, I don't want him here,

14    then he's allowed to be trespassed.  I think that the police

15    needed to establish that Mr. Feazell didn't have a right to be

16    there, and they didn't establish that.  And because they didn't

17    establish that, they didn't establish trespassing.

18         The government hasn't provided a single case showing

19    someone convicted of trespassing in a home where they were

20    residing.  This was the home where Mr. Feazell lived.  This was

21    the address that was on file with United States Probation.  This

22    was the home where they went to his apartment to try to find

23    him.  The police knew that he lived there, and so I don't

24    believe that it can be trespassing.

25         And as far as the common room, I think it's pretty clear

1   from the video that there are no hours posted.  The door was

2   unlocked.  There's no indication, other than Mr. Mason's

3   statement that they were in their after hours.  And also, again,

4   to trespass someone in their own home for being there after

5   hours seems like a novel interpretation of the law to me

6   because, again, you're allowed to be in the building that you

7   reside in.

8        And so, ultimately -- and one final point about -- two more

9   final points about trespassing.

10        And again, as you saw in the video, the police came and

11   they did warn the other inhabitants.  They didn't get into the

12   room, see that there were so many --

13           THE COURT:  And if it will help speed this up --

14           MR. KENNEDY:  Okay.  I'm sorry.  I'll --

15           THE COURT:  -- I think trespass is your stronger

16   argument.  I don't think it's been disputed that Mr. Feazell

17   lives there.

18           MR. KENNEDY:  Okay.  Okay.  I will wrap up, then.

19           THE COURT:  Okay.

20           MR. KENNEDY:  In conclusion, there was not probable

21   cause to arrest him for eluding or trespassing, and I believe

22   that the weapon should be suppressed.

23           THE COURT:  Thank you.

24           MS. CRISHAM:  Thank you, Your Honor.

25        Your Honor, Officer Malo Teo had ample probable cause to

1    arrest and search the defendant for two different crimes.

2        The first crime was the eluding offense that happened in

3    the early morning hours of July 28th.  The defense's briefs and

4    argument just now rely primarily on hypothetical scenarios,

5    assumptions, or misstating what the testimony was.  But the

6    officer's testimony today made clear that those assumptions were

7    wrong, and that based on the facts that the officer knew at the

8    time, he did have probable cause to arrest Mr. Feazell for

9    driving the white truck that eluded officers.

10        He testified specifically that he was looking for the white

11    truck that evening because he found the behavior of the men

12    associated with that truck suspicious.  And he went into all of

13    his reasons.

14        And I think the argument that the officer was specifically

15    after Mr. Feazell is laughable.  He had no idea when he was

16    looking for that white truck that Doneale Feazell even existed.

17    He did not know what he looked like.  He laid eyes on him for

18    the first time when he saw him sitting in the driver's seat at

19    that parking lot.

20        He testified his job is to protect the community.  He saw

21    two girls -- two women, and one who appeared to have been

22    drugged, who had been with men who were engaged in suspicious

23    behavior, and so that was absolutely, frankly, the right thing

24    for him to be doing was to try to find out more information

25    about this.

1        THE COURT:  The only question I have for you on the

2    issue of PC for eluding is a point that Mr. Kennedy made:  What

3    was the eluding?  How did Mr. -- how did the officer come to

4    believe or have a reasonable belief that there was eluding

5    taking place?

6        MS. CRISHAM:  Well, he -- the videos, I don't know if

7    this particular one was shown, but his body-worn video of him in

8    the car, he is behind the truck.  It also was called out on the

9    CAD.  He testified, I believe, that he heard Officer Jay say, He

10   eluded, that he had gone through the red lights.  And then also

11   just with the subjective knowledge doctrine, as well, that

12   knowledge would be imputed to him, as well.  But I think that

13   the evidence is clear here that he actually did know.

14       I can move on to trespass, if that would be --

15       THE COURT:  You can.

16       And I'll follow up on a question I asked Mr. Kennedy, I

17   mean, you're not disputing that Mr. Feazell lived there?

18       MS. CRISHAM:  It appeared, yes, that he was living

19   there.

20       THE COURT:  And just -- and I get these arguments

21   regarding the curfew, and he was a guest, and there was a fake

22   name, looks kind of sketchy, but is it not a little -- when you

23   step back a little bit, is it not a little odd that he's going

24   into this apartment building and arresting somebody for

25   trespass?  Usually, people just say -- the police just say, You

1   guys have to leave.

2          MS. CRISHAM:  Well, what -- but he said -- what

3   Officer Malo Teo said was that he was going to arrest for

4   eluding.  He said that the plan for everyone else --

5          THE COURT:  Right, but your argument is that there was

6   also probable cause to arrest for trespass.

7          MS. CRISHAM:  Yes.  And I believe he testified to

8   that.

9       And I think it's important to clarify what the revised code

10  is, because I think it was not stated fully by the defense.  RCW

11  9A.52.007 says that a person is guilty of criminal trespass in

12  the first degree if he or she knowingly enters or remains

13  unlawfully in the building.

14      Officer Malo Teo had information from Mr. Mason that they

15  had been told repeatedly to leave and had not.  He had probable

16  cause to believe that Mr. Feazell was remaining unlawfully in

17  the building in that common area.

18      Again, I think that the officer was clear that, to him, the

19  more serious crime, certainly, was the eluding.  But he also

20  knew that he did have the right to arrest Mr. Feazell for

21  trespass.

22      And the defense claims that we didn't cite any cases to

23  that effect, that's not accurate.  The *Atwater* case makes clear

24  that an arrest does not violate the Fourth Amendment, even if it

25  technically could have been resolved by a citation under state

1    law.

2        Under federal law, probable cause does exist if -- if there

3    is probable cause to believe that that crime had been committed.

4        And here, based upon all the circumstances, including the

5    video we watched, where Mr. Mason says, They're all trespassing,

6    they've all been asked to leave, and they're not leaving, that

7    knowledge is what gave Officer Malo Teo the ability kind of on

8    an independent basis to also arrest Mr. Feazell for eluding.

9            THE COURT:  If you're a resident of the building, but

10    you're in the common area after curfew, is that trespass?

11            MS. CRISHAM:  If he's being asked to -- if he's

12    remaining unlawfully in an area, yes.  I mean, I think that's

13    clearly what the code says.  The cases cited by the defense, you

14    know, indicate, and this is a novel use of this theory, are all

15    entirely imposit (phonetic).  They talk about, you know, the

16    ability of someone to walk through common areas, you know, a

17    hallway or an elevator to get up to one's unit.  This is

18    different.  This is a separate room.  This is later in the

19    evening.  They've been asked to leave that room.  They clearly

20    are trespassing.

21        And I think, in addition, even if the officer was mistaken

22    as to the law, uhm, that still does not mean he did not have

23    probable cause there.  And I think that we look there to the

24    *Heien v. North Carolina* case, which says that a mistake in law

25    does not necessarily, you know, negate the probable cause.

1          You know, I think it's clear that there was probable cause

2     for eluding.  I think that the officer made clear that that was

3     his primary basis for going to the apartment that night.

4               THE COURT:  And you agree that the evidentiary

5     standard is preponderance of the evidence?

6               MS. CRISHAM:  Probable cause is --

7               THE COURT:  My understanding is that -- where is it

8     here.  Probable cause:  An officer has probable cause when they

9     have reasonably trustworthy information sufficient to lead a

10    person of reasonable caution to believe that an offense has been

11    or is being committed by the person being arrested.  Probable

12    cause is not a high bar, but rather reflects only the kind of

13    fair probability on which reasonable and prudent people, not

14    legal technicians, act.  And that's from the *Kaley v. U.S.* case,

15    571 U.S. 320, page 338.

16          I was just curious as to whether I apply an evidentiary

17    standard with that, like preponderance of the evidence.

18              MS. CRISHAM:  I think it is what the case law says.

19    You know, it's a common sense kind of fluid standard.  And I

20    think that, clearly, the facts that Officer Malo Teo was aware

21    of, you know, show that there was probable cause to believe that

22    two different crimes had been committed, both the eluding and

23    the trespass here, and that he had the basis to arrest and then

24    search for both of those.

25              THE COURT:  Okay.  Thank you.

1          MS. CRISHAM:  Thank you, Your Honor.

2          THE COURT:  Any rebuttal?

3      And if you could limit your rebuttal to counsel's

4   presentation.

5          MR. KENNEDY:  Okay.  I'll be very, very quick.

6      As Your Honor stated, you can't be trespassing in your own

7   home.

8      The government says that they cited a case.  The case had

9   to do with arresting someone for the wrong -- for something that

10  they should have been given a citation for, had nothing to do

11  with trespassing.

12     The cases that I cited had to do with someone being allowed

13  to be in a part of the building where if -- at least they were

14  there with a tenant.  So even if Mr. Feazell wasn't a tenant, he

15  was allowed to be there with his relative.

16     As far as the eluding, again, the fact is that Officer Malo

17  Teo did not see Mr. Feazell eluding from police.  He supposedly

18  saw him earlier, but he did not see him in the process of

19  eluding.  He made the justification afterward, not in advance.

20  I believe that it's very significant that he was told who

21  Mr. Feazell was, what Mr. Feazell looked like, before he then

22  wrote in his report, I saw Doneale Feazell to be driving.  If

23  he'd seen Mr. Feazell driving, he would have written in his

24  report, he had dreadlocks and long hair.  He would have sent it

25  over the radio.  He would have responded to the radio call that

 1    it was a Hispanic male and said, no, it's a black man with

 2    braids.

 3            And for that reason, I don't believer that there was

 4    probable cause.

 5            THE COURT:  Okay.  Thank you.

 6        All right.  Counsel, I know that you're probably wanting a

 7    ruling on this as quickly as possible.  We have gone later than

 8    expected.  I mean, I want to get through the pretrial conference

 9    pretty quickly here.

10        I'll just let you know that right now, my tentative view is

11    that I'm going to deny the motion to suppress.  I have questions

12    with the government's theory as to the trespass issue, but I

13    don't think I need to reach that issue because I do think that

14    there was probable cause on the eluding question.

15        That's a tentative view.  I'm going to review the materials

16    that have been submitted by the parties, go over what's been

17    presented at this hearing again.  And after I feel more

18    confident about my ruling, I'll issue a written order.

19        Hopefully, we can get through the pretrial conference

20    agenda fairly expeditiously here.

21        I just want to briefly go over the procedural aspects of

22    the trial and let you know how I plan to try this case.

23        First of all, who will be counsel at trial, will it be Ms.

24    Crisham and Mr. Kennedy?

25            MS. CRISHAM:  Yes, Your Honor.

1          MR. KENNEDY:  Yes, it would be, Your Honor.

2          THE COURT:  All right.  Are folks ready to try the

3     case on March 31st?

4          MR. KENNEDY:  I don't anticipate that this will end up

5     going to trial on March 31st.  I believe that if -- regardless

6     of how this evidentiary ruling comes out, I believe that we

7     would anticipate a plea, or the case being dismissed if we were

8     to prevail.

9        And I believe that if the case were to, for whatever

10    reason, need to continue, Ms. Crisham and I talked and we

11    thought that it might be worthy of seeking a short, additional

12    continuance.

13         THE COURT:  Ms. Crisham?

14         MS. CRISHAM:  That's accurate, Your Honor.

15         THE COURT:  So would the parties prefer to forego the

16    pretrial conference right now and wait until I issue my ruling?

17         MR. KENNEDY:  That's fine with me, Your Honor.

18         MS. CRISHAM:  That would be amenable to the government

19    as well.

20         THE COURT:  Okay.  I'll have to check in with my

21    trustee law clerk here, but I think we'd be able to get a

22    written ruling out by next week.

23         MS. CRISHAM:  Thank you, Your Honor.

24         MR. KENNEDY:  Thank you, Your Honor.

25         THE COURT:  Thank you very have much for your

1  presentations.

2        We'll be in recess.

3              THE CLERK:  All rise.

4        Court is in recess.

5                    (Court recessed 4:36 p.m.)